the statute is vague when applied to the conduct of others. *Rung, supra*. As stated above, we find that § 16-21 requires the operator of a motor vehicle registered in this state to produce an insurance policy, proof of a policy, or proof of financial responsibility to requesting law enforcement officers. Meints failed to produce the required proof, and therefore, he lacks standing to assert that § 16-21 is void for vagueness.

## V. CONCLUSION

Finding that the evidence supports Meints' conviction and that § 16-21 of the Beatrice City Code is not unconstitutional, we affirm the decision of the district court affirming the decision of the trial court.

Affirmed.

---

In re Interest of Chloe C., a child
under 18 years of age.
State of Nebraska, appellee, v.
Staci C., appellant.

In re Interest of Carly C., a child
under 18 years of age.
State of Nebraska, appellee, v.
Staci C., appellant.

___ N.W.2d ___

Filed May 21, 2013.    Nos. A-12-921, A-12-922.

1. **Juvenile Courts: Appeal and Error.** An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings.
2. **Parental Rights: Proof.** In Nebraska statutes, the bases for termination of parental rights are codified in Neb. Rev. Stat. § 43-292 (Cum. Supp. 2012). Section 43-292 provides 11 separate conditions, any one of which can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child.
3. **Parental Rights: Evidence: Appeal and Error.** If an appellate court determines that the lower court correctly found that termination of parental rights is appropriate under one of the statutory grounds set forth in Neb. Rev. Stat. § 43-292 (Cum. Supp. 2012), the appellate court need not further address the sufficiency of the evidence to support termination under any other statutory ground.

4. **Parental Rights.** Neb. Rev. Stat. § 43-292 (Cum. Supp. 2012) requires that parental rights can be terminated only when the court finds that termination is in the child's best interests.

5. **Parental Rights: Evidence.** In determining whether it is in the best interests of the child for the court to terminate parental rights, the lower court can consider relevant evidence of facts occurring within the time period before the filing of the termination action, as well as those that have transpired since the date of the filing of the motion or petition seeking the termination of parental rights, such as those relating to parental efforts and behavior, and the needs or circumstances of the child.

6. **Parental Rights.** Children cannot, and should not, be allowed to linger in foster care while waiting to see if the parent will mature.

7. ____. Where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of parental rights.

8. **Parental Rights: Parent and Child.** In considering the issue of whether it is in the best interests of the child for the court to terminate parental rights, it is important to remember that the law does not require perfection of a parent. Instead, the court should assess whether the parent has made continued improvement in parenting skills and whether a beneficial relationship has been established between the parent and the child.

Appeals from the County Court for Saunders County: Gerald E. Rouse, Judge. Reversed and remanded with directions to dismiss.

Jennifer D. Joakim for appellant.

Jonathan M. Frazer, Deputy Saunders County Attorney, for appellee.

Sievers, Pirtle, and Riedmann, Judges.

Riedmann, Judge.

## INTRODUCTION

Staci C. appeals from the orders of the county court for Saunders County, sitting as a juvenile court, which terminated her parental rights to her daughters, Chloe C. and Carly C. Although there is a separate record for each case, the appellant and the issues raised on appeal are the same, and therefore, we consolidate these cases for resolution. Because we find the State failed to prove by clear and convincing evidence that terminating Staci's parental rights was in the best interests of Chloe and Carly, we reverse the judgments of the juvenile

court and remand the causes with directions to dismiss the motions for termination.

## BACKGROUND

Staci is the biological mother of Chloe, born in June 2003, and Carly, born in September 2007. On January 22, 2010, authorities were called to Chloe's school after bruises were seen on Chloe's buttocks. Chloe reported at that time that she had been living for approximately 2 weeks with a woman who was a family friend of Staci's boyfriend, Tim Peterson, and that Staci was living with Peterson. That same day, the children were placed in foster care. They were later adjudicated as children within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2008).

Criminal charges were filed both against Peterson, for causing the bruising on Chloe, and against Staci, for failing to protect Chloe. Staci was convicted and placed on probation. One of the conditions of her probation was to refrain from any contact with Peterson, but because she continued to contact him, her probation was revoked and she served 30 days in jail. Staci was also later convicted of felony theft after stealing money from Peterson's family friend, with whom Chloe and Carly had lived, and was sentenced to 20 months to 5 years' incarceration. She was granted work release after serving 4 months and was paroled in February 2012.

After Chloe and Carly were removed from Staci's care, a case plan was developed which included several goals. Staci was to "'put her children's needs ahead of her own needs 100 percent of the time.'" Staci was also to provide a safe and stable living environment and enhance her parenting skills to meet the children's basic needs and keep them safe. In September 2010, Staci underwent a psychological evaluation. After this evaluation, an additional outcome was added whereby Staci was to follow all mental health treatment recommendations and to maintain a stable lifestyle environment for her children.

The State moved to terminate Staci's parental rights on November 15, 2011. At the same time, the State moved to terminate the parental rights of Chloe's father and Carly's

father. The court terminated the fathers' rights, and that decision is not being appealed; therefore, we do not address those terminations.

The termination hearing was held on May 1 and July 10, 2012. At the termination hearing, Staci conceded that her children had been in an out-of-home placement for 15 or more months of the most recent 22 months.

The evidence adduced at the termination hearing revealed that before becoming involved with Peterson, Staci was living with her children in an apartment in Iowa and working as a certified nurse aide. In July 2009, Staci moved herself and her children to Nebraska to be with Peterson. Staci had met Peterson on the Internet, and he promised they would get married and indicated that if things went well, he might even adopt her children. After moving to Nebraska, Staci obtained employment as a cook at a nursing home. Her relationship with Peterson was "good at first," but he became verbally and mentally abusive. Eventually, the abuse turned physical. When asked about why the girls were living with Peterson's family friend prior to the State's involvement, Staci said that she had asked the family friend if Staci could bring the girls over to stay with her, because Staci knew she would still be able to see them but that they would be out of "harm's way." At that time, Staci did not have any other friends or family in Nebraska.

Staci admitted that during the first year of her case plan, she did not do what was asked of her. She testified that the reason for her noncompliance was due to Peterson's control over her: She was not able to leave the house when she wanted to, she was not allowed to get money from her own paycheck, and she could not get where she needed to go because he kept the keys to her car. Staci testified that Peterson controlled her financially and that out of the $400 or $500 per month she earned, he would give her only $50 and would spend the rest of her money on himself. According to Staci, Peterson "was the control, the power, and you do as I say or there's going to be severe consequences." Sabine Grover, Staci's direct program support worker, testified that Staci was fearful of Peterson and that there was "a control factor" present.

Staci ended her relationship with Peterson by the end of 2010. In January 2011, she entered a domestic violence shelter called Safe Haven. Safe Haven is a 6-week program where victims of domestic violence can get therapy, have a safe and confidential place to live, and get support and help with whatever is needed. While at Safe Haven, Staci completed a parenting class and participated in a domestic violence support group. Jennifer Roth, a family permanency specialist who worked with Staci, testified that Staci made progress once she entered the Safe Haven program. Grover also noticed positive changes in Staci during the time she was at Safe Haven. Grover testified that Staci was learning new skills and implementing them with her children and that they were working. Grover stated, "I was really impressed."

In November 2011, while out on work release, Staci contacted Voices of Hope, a program that provides services for sexual assault and domestic violence victims. Staci requested one-on-one advocacy and met with a counselor once a week for 8 weeks. Besides working with a counselor, she also attended a domestic violence support group and completed a "DV101 psycho-educational group." Kacey Barrow, Staci's counselor at Voices of Hope, testified at the termination hearing that the main goal during that time was to find housing and that Staci would do a lot of self-advocacy by using the telephone, writing letters, and making contacts. Barrow described Staci as "very motivated" to make changes in her life. Barrow and Staci would also discuss having a support system and how Staci should prepare for parole and getting her children back. During sessions at Voices of Hope, Staci was always early, was always prepared, did the work requested of her, was always the first to engage, and was very open.

The testimony from caseworkers and support workers at the termination hearing indicated that Staci attended visits with her children a majority of the time and that the visits generally went very well. The girls were always excited to see Staci and would run to her, jump into her arms, and hug her. Staci would interact appropriately with the children, and although she had some difficulties with parenting skills along the way, Staci was usually willing to learn and correct those problems.

Grover testified that during the time she spent with Staci, she noticed improvements in Staci's parenting skills in that she had more patience, took more time with the girls, would get down on their level to communicate with them, would redirect their behavior appropriately, and just started "doing all the right things."

When Grover took over as Staci's support worker in July 2010, the visits were held at a city park. Grover testified that it was very hot outside and that the girls were irritable because of the heat, but Staci engaged them and did the best she could under the circumstances. Eventually, Staci took the initiative to get permission to have visits at a community center which was air-conditioned and had a big room where they were able to do crafts and activities and play with toys. When Staci was at Safe Haven, the visits were held in a church where they were able to watch videos and eat snacks. After the church building closed, Staci gained permission to have visits at the building where she was taking domestic violence and parenting classes.

After Staci was paroled, she entered a transitional shelter for women. While at the shelter, she completed a life skills class and was involved in vocational rehabilitation. At the time of the termination hearing, Staci had been working at a new job for 3 weeks. She had also been approved for housing assistance and was on the waiting list for a voucher. Staci testified at the termination hearing that through all of the programs and classes she completed, she has gained insight into her own situation and realized the extent to which her relationship with Peterson has interfered with her relationship with her children.

After the termination hearing, the court entered orders terminating Staci's parental rights to Chloe and Carly. The court found that Staci continued to see Peterson even after the State took custody of the girls and ordered her not to have contact with him. The court also found that Staci had not followed the case plans, had been in and out of placements, and had served prison time. The court noted that Staci conceded that the girls had been in an out-of-home placement for 15 or more months of the most recent 22 months. Finally, the court determined

that the best interests of the children required they find permanent placement and that Staci's parental rights be terminated. Staci timely appeals.

## ASSIGNMENTS OF ERROR

Staci assigns that the juvenile court erred in finding that the State proved by clear and convincing evidence that (1) Staci failed to correct the conditions leading to the adjudication and that reasonable efforts were provided pursuant to Neb. Rev. Stat. § 43-292(6) (Cum. Supp. 2012), (2) Staci substantially and continuously or repeatedly neglected and refused to give the children necessary parental care pursuant to § 43-292(2), (3) Staci is unable to discharge parental responsibilities due to mental illness or mental deficiency pursuant to § 43-292(5), and (4) terminating Staci's parental rights was in the best interests of her children.

## STANDARD OF REVIEW

[1] An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Jorge O.*, 280 Neb. 411, 786 N.W.2d 343 (2010).

## ANALYSIS

*Grounds for Termination.*

[2] In Nebraska statutes, the bases for termination of parental rights are codified in § 43-292. Section 43-292 provides 11 separate conditions, any one of which can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child. *In re Interest of Sir Messiah T. et al.*, 279 Neb. 900, 782 N.W.2d 320 (2010).

In its order terminating Staci's parental rights to Chloe and Carly, the juvenile court did not specifically identify the subsections it was addressing. However, the court found that Staci had not followed the case plans ordered by the court (§ 43-292(6)) and that Chloe and Carly had been in an out-of-home placement for 15 or more months of the most recent 22 months (§ 43-292(7)).

Staci concedes that Chloe and Carly have been in an out-of-home placement for 15 or more months of the most recent 22 months. The girls were removed from Staci's home on January 22, 2010. At the time the motions to terminate parental rights were filed on November 15, 2011, Chloe and Carly had been in an out-of-home placement for almost 22 months. At the time the termination hearing began on May 1, 2012, the girls had been in an out-of-home placement for over 27 months. Our de novo review of the record clearly and convincingly shows that grounds for termination of Staci's parental rights under § 43-292(7) were proved by sufficient evidence.

[3] If an appellate court determines that the lower court correctly found that termination of parental rights is appropriate under one of the statutory grounds set forth in § 43-292, the appellate court need not further address the sufficiency of the evidence to support termination under any other statutory ground. *In re Interest of Justin H. et al.*, 18 Neb. App. 718, 791 N.W.2d 765 (2010). Therefore, this court need not review termination under § 43-292(2), (5), or (6). Once a statutory basis for termination has been proved, the next inquiry is whether termination is in the child's best interests.

*Chloe's and Carly's Best Interests.*

[4,5] Staci argues that the juvenile court erred in finding that terminating her parental rights was in Chloe's and Carly's best interests. Section 43-292 requires that parental rights can be terminated only when the court finds that termination is in the child's best interests. In determining whether it is in the best interests of the child for the court to terminate parental rights, the lower court can consider relevant evidence of facts occurring within the time period before the filing of the termination action, as well as those that have transpired since the date of the filing of the motion or petition seeking the termination of parental rights, such as those relating to parental efforts and behavior, and the needs or circumstances of the child. See *In re Interest of Aaron D.*, 269 Neb. 249, 691 N.W.2d 164 (2005).

[6,7] The appellate courts of Nebraska have repeatedly cautioned that children cannot, and should not, be allowed

to linger in foster care while waiting to see if the parent will mature. See, *In re Interest of Destiny A. et al.*, 274 Neb. 713, 742 N.W.2d 758 (2007); *In re Interest of DeWayne G. & Devon G.*, 263 Neb. 43, 638 N.W.2d 510 (2002); *In re Interest of Kenna S.*, 17 Neb. App. 544, 766 N.W.2d 424 (2009); *In re Interest of Eden K. & Allison L.*, 14 Neb. App. 867, 717 N.W.2d 507 (2006); *In re Interest of Stacey D. & Shannon D.*, 12 Neb. App. 707, 684 N.W.2d 594 (2004). Similarly, where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of parental rights. *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012).

[8] However, in considering the issue of whether it is in the best interests of the child for the court to terminate parental rights, it is important to remember that the law does not require perfection of a parent. See *In re Interest of Aaron D., supra*. Instead, the court should assess whether the parent has made continued improvement in parenting skills and whether a beneficial relationship has been established between the parent and the child. See *In re Interest of Justin H. et al., supra*.

In the present case, several witnesses at the termination hearing rendered the opinion that terminating Staci's parental rights was in Chloe's and Carly's best interests. One witness was the caseworker from January through October 2010, who then became involved again in December 2011. She testified that she believed terminating Staci's parental rights was in the children's best interests because Staci had "made very poor choices" in the previous 2 years in regard to "her criminal aspect of things" and she could not maintain housing and stable employment in order to get the girls back in her home and parent them 100 percent of the time.

Roth was the family permanency specialist from July 2010 through November 2011. She opined that terminating Staci's parental rights was in the children's best interests, because they need to have a stable environment and they had not had that, nor had Roth seen that Staci had been able to provide that. The children and family services specialist for the case beginning in January 2012 opined that terminating Staci's parental rights was in the children's best interests because of the lack

of progress on the case plan goals and the length of time the children had been out of Staci's home without permanency. However, that specialist admitted she had never observed Staci with her children.

Despite this testimony, based on all of the evidence presented at the termination hearing, we find that Staci has demonstrated a continued improvement in her parenting skills and has established a beneficial relationship with her children. We consider Staci's initial lack of progress in light of the surrounding circumstances. Barrow, Staci's counselor, testified about the "cycle of violence" that Staci had been caught in during her relationship with Peterson, whereby the victim stays with an abusive partner because the victim does not feel like he or she deserves any better. Breaking that cycle consists of empowering victims to see that they do not deserve the abuse and that they do not have to live like that. Barrow testified that she believes Staci had made strides to ensure that she would not return to her previous situation.

We note that it was Staci who took the initiative to contact Safe Haven and enter the program. And once Staci was able to break out of that cycle of violence, she made efforts toward meeting her case plan goals. While we acknowledge that there is evidence to the contrary, the general testimony was that after Staci ended her relationship with Peterson, she showed continual improvement. This is not to suggest that Staci is a perfect parent, and we find many of her choices to be questionable at best. However, we also find compelling the fact that before Staci's relationship with Peterson, she and her children were living independently and she maintained steady employment in order to support her family. At the time of the termination hearing, Staci had secured employment and had been approved for housing assistance. As a general proposition, it can be said that what harm has befallen the children, such occurred while Staci was involved with Peterson. Not only has Staci ended that relationship, she has been actively engaged in the process of learning about domestic violence and self-improvement so as to avoid such situations in the future—all of which is to the benefit of, and in the best interests of, her children.

The evidence presented at the termination hearing revealed that Staci consistently attended visitation with her children, she interacted appropriately with them most of the time, and she was willing to accept and implement suggestions from the caseworkers. Additionally, the evidence shows that there is a beneficial relationship between Staci and her children, because the girls were always very excited to see Staci and enjoyed their visits with her. We appreciate that Staci still has work to do before achieving reunification. However, as we stated above, we do not require perfection of a parent when deciding whether termination of parental rights is appropriate.

We conclude that there is insufficient evidence to prove that termination of Staci's parental rights to Chloe and Carly is in the children's best interests.

## CONCLUSION

We find that the juvenile court erred when it found that the State had proved, by clear and convincing evidence, that terminating Staci's parental rights would be in Chloe's and Carly's best interests. Accordingly, we reverse the judgments of the juvenile court and remand the causes with directions to dismiss the motions for termination.

Reversed and remanded with directions to dismiss.