IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**

IN RE INTEREST OF ELIJAH P. ET AL.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF ELIJAH P. ET AL., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,
V.
JENNIFER C., APPELLANT.

Filed January 14, 2014.    No. A-13-341.

Appeal from the Separate Juvenile Court of Douglas County: CHRISTOPHER KELLY, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, and Joy M. Suder for appellant.

Donald W. Kleine, Douglas County Attorney, Jennifer Chrystal-Clark, and Patrick C. McGee, Senior Certified Law Student, for appellee.

IRWIN, MOORE, and BISHOP, Judges.

MOORE, Judge.

INTRODUCTION

Jennifer C. appeals from the order of the separate juvenile court of Douglas County, which terminated her parental rights. Following our de novo review of the record, we conclude that sufficient grounds existed for the termination of Jennifer's parental rights and that the termination was in the best interests of these children. We further conclude that Jennifer was not denied due process during the proceeding. Accordingly, we affirm.

BACKGROUND

Jennifer is the mother of Elijah P., born in June 2006; Airion P., born in September 2007; Aryiona C., born in December 2009; James D., Jr. (James Jr.), born in April 2011; and Jayvion D., born in May 2012. Elijah and Airion's father is deceased. Aryiona's father is unknown. The

- 1 -

father of the youngest two children relinquished his parental rights prior to the termination hearing in this case. Because none of the fathers are involved in this appeal, we do not address them further. Jennifer's oldest three children were removed from her care in April 2010, after she left Elijah home alone and he was found wandering outside of the house. James Jr. and Jayvion were removed from Jennifer's care upon their respective births. The children were all placed in the same foster home and have remained in foster care placement continuously since their removal.

The State filed a petition in the juvenile court on April 10, 2010, alleging that Elijah, Airion, and Aryiona were children within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2008) and lacked proper parental care due to the faults or habits of Jennifer. The petition specifically referenced the incident when Elijah was found unsupervised--wandering outside with no shoes or socks on and crying--and law enforcement found no one home at Jennifer's residence. The State filed an amended petition on June 10, adding the allegation that Jennifer had been diagnosed with mild mental retardation. On July 21, the juvenile court found that Elijah, Airion, and Aryiona were within the meaning of § 43-247(3)(a). The State filed subsequent supplemental petitions after the births of James Jr. and Jayvion and these children were adjudicated as being within the meaning of the statute on September 7, 2011, and December 4, 2012, respectively.

Jennifer was ordered to comply with various rehabilitation plans, which consistently required her to participate in individual therapy, cooperate with family support workers, obtain and maintain safe housing and a legal source of income, and be allowed visitation with her children. These were the requirements of the rehabilitation plan in place at the time the State filed its motion for termination of Jennifer's parental rights. Various other requirements appeared in Jennifer's rehabilitation plans over the course of this case, but for purposes of this appeal, we only note that the plan of November 19, 2010, also required her to participate in developmental disabilities services, while the subsequent plan of February 16, 2011, required her to sign a release of information to establish her eligibility for developmental disabilities services. There were no requirements with respect to developmental disabilities services in plans ordered by the juvenile court after February 2011.

On December 21, 2012, the State filed a motion for termination of Jennifer's parental rights to all five children, alleging that termination was proper under Neb. Rev. Stat. § 43-292(2) and (6) (Cum. Supp. 2012), that termination was proper with respect to the oldest four children under § 43-292(7), and that termination of Jennifer's parental rights was in all of the children's best interests.

The juvenile court heard the State's termination motion on March 27 through 29, 2013. The court heard testimony from witnesses, including case managers and workers, visitation and family support workers, and therapists, and received various exhibits into evidence.

The testimony at trial shows that both Jennifer and Elijah were offered individual therapy, the family was provided with visitation and family support services, and developmental disability services were offered to Jennifer. We have addressed each of these areas of service in turn.

Jennifer saw Barb Vaughn for therapy at least once per week between April 2010 and about August 2011. Vaughn worked with Jennifer on mental health issues and to improve her

communication and social skills. Specifically, Vaughn worked with Jennifer on parenting skills and proper interactions with people, such as manners, courtesy, and respect. Although Jennifer had been diagnosed with mild mental retardation, Vaughn felt that Jennifer was able to understand what they were doing in therapy. Jennifer's attendance at therapy sessions was erratic; at some points, she would attend, but at other times, she felt she did not need therapy. Jennifer's insistence at times that she no longer needed therapy was a barrier to her progress. According to Vaughn, Jennifer sometimes applied the parenting solutions they discussed in therapy, but at other times, she disregarded them, saying she did not need those techniques. Jennifer did improve her social skills, becoming more polite during sessions, greeting Vaughn, and dressing more appropriately. Toward the end of their relationship, Jennifer called quite frequently to cancel therapy and also frequently failed to notify Vaughn that she would be absent. Vaughn was not sure if her efforts to help Jennifer were successful. Vaughn stopped working with Jennifer around August 2011, because Jennifer felt she no longer needed help; at that time, Vaughn felt that Jennifer still needed assistance and referred Jennifer to other agencies.

Tabitha Jameson provided therapy for Jennifer between August and December 2012. Jennifer ceased therapy with Jameson because she believed her parental rights were being terminated. Jennifer chose not to continue therapy, even though Jameson offered a month or two of continued therapy for Jennifer's own personal growth. Up until December 2012, Jameson saw Jennifer once a week for 45 minutes to 1 hour. Jennifer told Jameson that she felt like she had already received sufficient therapy, but during her treatment with Jameson, Jennifer was fairly consistent in her attendance. The psychologist Jameson worked with diagnosed Jennifer with an adjustment order with anxiety and depressive features. Jennifer's main counseling goals with Jameson were decreasing depression and anxiety with the aim of regaining custody of her children. Jameson hoped to help Jennifer gain some insight as to why Jennifer lost her children and as to how Jennifer's mental health affected the situation. Jameson reported that their work on Jennifer's anxiety and depression was fairly limited because Jennifer wanted to focus more on parenting and what was specifically keeping her from being reunited with her children. According to Jameson, Jennifer took complete responsibility for leaving Elijah alone and knew that her behavior in the situation was unacceptable. They also discussed Elijah's behavior issues. Jameson reported that Jennifer felt her difficulty controlling Elijah's behavior during visits was hindering reunification. Jameson worked with Jennifer on behavior modification for the children, and their efforts in this regard included things like clarifying and simplifying rules for the children and trying different methods of reward and consequence.

Connie White provided therapy to Elijah beginning on January 7, 2012. Elijah was experiencing behavioral problems during visits with Jennifer. White conducted a pretreatment assessment of Elijah, and Dr. Shereatha Rollings conducted a mental status examination. According to White, Elijah was initially diagnosed with adjustment disorder with disturbance of emotions and conduct, and he had a pending diagnosis of oppositional defiant disorder. White also noted "rule-out" diagnoses of fetal alcohol syndrome and attention deficit disorder, but she testified that a physician would have to assess Elijah further to make those determinations. White worked with Elijah to help him process his anger and calm himself down when he had outbursts. White worked with the adults in Elijah's life, including his parents, foster parents, and school personnel, on behavior modification techniques. White testified that if behavior modification

tactics are not followed, Elijah will regress, be confused, be inconsistent, and suffer long-term difficulties with adults and peers. White provided therapy for Elijah twice a week until December 2012, when she reduced the number of sessions due to his progress in school; however, more recently, Elijah's behavioral problems at school escalated.

White testified that inconsistency in visits with Jennifer was one of the causes for the escalation in Elijah's behavior problems. White had four therapy sessions with Jennifer in May 2012 before Jennifer declined to continue because she felt therapy did not benefit her. White felt that Jennifer would have benefited from continued individual therapy and recommended it to Jennifer. White felt that Elijah still needed therapy to assist him with his diagnoses, but she estimated that the amount of further therapy needed would depend on Elijah's placement. White testified that Elijah needed permanency in order for him to progress and that Jennifer would need to progress in individual therapy before family therapy could be a productive option. Elijah has most of his negative behaviors when he is with Jennifer and rarely has them when he is at his foster home. When Elijah started having fewer visits with Jennifer, he began to show signs of stabilization and fewer outbursts.

Family support services were provided to Jennifer both during visitation and in individual sessions. The objective of family support work during visitation is for the parent to learn to implement proper parenting techniques, discipline, and structure for the children. During individual family support sessions, the goal is to help the parent create and maintain household rules for the children to follow, to help the parent find and maintain employment, and also to help the parent access community resources. Jennifer was not always consistent in participating in family support services, and when she did participate, she became bored easily and had difficulty engaging. She also had difficulty accepting constructive criticism and positive feedback from workers. Workers raised concerns regarding Jennifer's engagement with her children during visits and her failure to use consistent discipline. Jennifer felt she had sufficient parenting experience already and that the workers could not help her because they were young and did not have children of their own.

Separate visitation workers assisted Jennifer in parenting her children by focusing on the interactions between Jennifer and her children during visits. Jennifer was generally consistent in attending visitations, but she never attained unsupervised visits. She did have problems in supervising and disciplining the children and in taking redirection from workers. Workers observed certain safety issues in the home, and Jennifer sometimes did not provide age-appropriate, nutritious food. One worker testified that he had to assist Jennifer in calming Elijah on several occasions after he had gotten out of control. That worker once had to stop a visit because Jayvion had a fever. He also observed Jennifer appearing to doze on one occasion and cautioned her about sleeping during visits.

With respect to developmental disability services, none of the case managers or workers involved in this case and who testified at the termination hearing were ever able to set up these services for Jennifer. Developmental disability services is a needs-based service program that includes vocational training, household managing skills, and parenting skills specifically for people with disabilities. Caseworkers tried to focus on developmental disability services for Jennifer because of her low intellectual functioning. Also, Jennifer's disability made it difficult to work with her because most things had to be explained to her multiple times. The record

shows that Jennifer refused to sign the necessary releases to set up developmental disability services despite being informed about the benefits and what specific assistance could be provided to her. Jennifer was adamant about not participating because she did not feel that the services were applicable to her.

With respect to other requirements of the case plan in place at the time of the termination hearing, the record shows that Jennifer never had any issue with her housing. She received legal income through disability benefits, but there were concerns because she was not working with family support on budgeting. She also refused to explain the source of certain money other than to say that she received it from the father of her youngest two children any time she needed it.

In general, the testimony at the termination hearing shows that Jennifer made poor or inconsistent progress in alleviating the conditions that led to the removal of her children. We have set forth the observations of several of the case managers and caseworkers who testified on this issue below.

Mark Wolford, who was the case manager between August and October 2011, felt that Jennifer made poor progress toward reaching goals required for reunification during his time managing the case. Wolford noted Jennifer's continued difficulty in properly supervising and controlling, not only Elijah due to his behavior issues, but also the rest of her children during visitation. Wolford also noted bickering and arguing between Jennifer and the father of the two youngest children that interfered with visitation, continued inconsistency in working with family support workers, and Jennifer's threats to stop attending therapy. Jennifer did make some progress with respect to providing better food for her children during visits. Finally, Wolford noted Jennifer made only minimal progress in therapy, which had to proceed at a very slow pace with frequent repetition of information.

Joel Case, the caseworker between September 2011 and February 2012, believed that Jennifer made only minimal progress during his time working with her. According to Case, Jennifer did not seem to understand or believe that she was doing anything wrong when she was parenting her children or that she needed to make any changes or improvements in her parenting. Jennifer continued to resist the recommendations made by the family support worker or Case. He also noted that she did not work with her therapist. Case noted that Jennifer did take suggestions from certain individuals at various points with regard to her parenting and did apply those suggestions for a short period of time; however, the suggestions were not consistently applied thereafter. Jennifer often fell back on her excuse that she did not feel that she was doing anything wrong and did not continue to implement the recommendations made to her on a daily basis.

Sarah Forrest, a family permanency specialist supervisor who managed the case at one point, noted that any improvement made by Jennifer in her parenting was short term, lasting only a few weeks. Forrest never saw sustainable progress from Jennifer either through documentation from the workers she supervised or through Jennifer's verbal reports that Jennifer was able to maintain what she was learning.

Nikki Barber took over management of the case from Forrest in May 2012 and was managing the case at the time of the termination hearing. Barber observed Jennifer interact with her children on two occasions and noted that Jennifer had a difficult time maintaining control of the children and giving them instruction. Barber did not see an improvement in Jennifer's parenting, despite instruction from the visitation workers and other services. At the time of the

termination hearing, Barber did not feel that additional services could be utilized to achieve reunification due to Jennifer's lack of progress during the time the children have been out of her home. Barber believed that termination of Jennifer's parental rights would be in the children's best interests. Barber felt that Jennifer had not made any real progress toward being able to parent appropriately, that she did not understand complex parenting techniques, that she was not consistent in terms of structure and discipline, and that she did not understand proper supervision or safety concerns.

On April 4, 2013, the juvenile court entered an order terminating Jennifer's parental rights to all five children. The court found clear and convincing evidence that termination was proper under § 43-292(2), (6), and (7) and that termination was in the children's best interests. Jennifer subsequently perfected her appeal to this court.

## ASSIGNMENTS OF ERROR

Jennifer asserts that the juvenile court erred in (1) finding that the State proved by clear and convincing evidence that her parental rights should be terminated pursuant to § 43-292(2), (6), and (7); (2) finding that termination of her parental rights was in the children's best interests; and (3) denying her due process through the trial judge's bias and impropriety.

Jennifer argues but does not assign as error that the juvenile court erred in finding that the State provided reasonable efforts to reunify the family. In order to be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error. *J.P. v. Millard Public Schools*, 285 Neb. 890, 830 N.W.2d 453 (2013).

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Samantha L. & Jasmine L.*, 286 Neb. 778, 839 N.W.2d 265 (2013).

## ANALYSIS

*Statutory Grounds.*

Jennifer asserts that the juvenile court erred in finding that the State proved by clear and convincing evidence that her parental rights should be terminated pursuant to § 43-292(2), (6), and (7). In order to terminate an individual's parental rights, the State must prove by clear and convincing evidence that one of the statutory grounds enumerated in § 43-292 exists and that termination is in the child's best interests. *In re Interest of Kendra M. et al.*, 283 Neb. 1014, 814 N.W.2d 747 (2012). Clear and convincing evidence is that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of the fact to be proved. *In re Interest of Leland B.*, 19 Neb. App. 17, 797 N.W.2d 282 (2011).

Under § 43-292(7), the State must show that the child has been in an out-of-home placement for 15 or more months of the most recent 22 months. The evidence was unchallenged that Elijah, Airion, and Aryiona have remained in out-of-home placements since April 2010, or nearly 3 years at the time of the termination hearing, and that James Jr. had been in out-of-home

placement for approximately 23 months. Accordingly, the State proved § 43-292(7) by clear and convincing evidence with respect to the four older children.

Because the State need prove only one ground for termination, we decline to consider Jennifer's assigned error regarding the court's determination that the State proved other grounds enumerated in § 43-292 with respect to the four older children. Generally, when termination is sought under subsections of § 43-292 other than subsection (7), the evidence adduced to prove the statutory grounds for termination will also be highly relevant to the best interests of the juvenile. *In re Interest of Emerald C. et al.*, 19 Neb. App. 608, 810 N.W.2d 750 (2012). Thus, we will consider evidence relevant to the other grounds in our analysis of the four older children's best interests.

Jayvion, however, had been in out-of-home placement for only approximately 11 months at the time of the termination hearing, so we must consider whether the State proved one of the other alleged statutory grounds in connection with Jayvion.

Under § 43-292(6), grounds for termination exist when reasonable efforts to preserve and reunify the family have failed to correct the conditions leading to the adjudication. It is the burden of the State, and not the parent, to prove by clear and convincing evidence that the parent has failed to comply, in whole or in part, with a reasonable provision material to the rehabilitative objective of the case plan. *In re Interest of Angelica L. & Daniel L.*, 277 Neb. 984, 767 N.W.2d 74 (2009).

The record shows that throughout this case, Jennifer was ordered to participate in individual therapy and visitation, cooperate with family support workers, and obtain and maintain safe housing and a legal source of income. She was also ordered at one point to participate in developmental disabilities services and to sign the releases necessary to obtain those services, although that was not a requirement of the plan in place at the time the termination motion was filed. While income and housing were not issues for Jennifer, she made limited progress in the other areas of her case plan. Jennifer did attend therapy with Jameson and Vaughn. She made some progress in her therapy, improving her social skills, but she frequently wanted to stop therapy, telling caseworkers and others that it did not benefit her. She was reluctant to focus on personal mental health issues such as anxiety and depression, preferring instead to focus on parenting techniques. Her insistence at times that she no longer needed therapy was a barrier to her progress, and she was inconsistent in applying parenting solutions discussed in therapy.

Jennifer received family support services but was inconsistent in participating. She was fairly consistent in attending visits with her children, but she never progressed beyond supervised visitation. Jennifer was very resistant to the advice and support provided by both family support and visitation workers, frequently claiming that their advice was not helpful or that she simply did not need it. Parenting techniques were demonstrated for her repeatedly, but Jennifer had difficulty maintaining progress for more than a few weeks at a time. She continued to have difficulty controlling the children during visits and providing consistent discipline. Jennifer was offered developmental disabilities services, which could have been of benefit to her due to her lower intellectual functioning. Although these services were explained repeatedly, she was adamant that she did not need them and that they were not applicable to her. She refused to sign the necessary releases so that a determination could be made as to what specific developmental

disabilities services could be provided to her. Also, other services have been provided to assist in reunifying Jennifer with her children; however, she has not successfully completed those services.

In conclusion, the record shows that Jennifer made minimal progress toward correcting her parenting issues. There is sufficient evidence in the record to support a finding that termination of Jennifer's parental rights to Jayvion under § 43-292(6) was proper, and the juvenile court did not err in making this finding. Because we have found that termination as to Jayvion was proper under § 43-292(6), we need not consider Jennifer's arguments against termination under § 43-292(2) with respect to Jayvion.

*Best Interests.*

Jennifer asserts that the juvenile court erred in finding that termination of her parental rights was in the children's best interests. A juvenile's best interests are a primary consideration in determining whether parental rights should be terminated as authorized by the Nebraska Juvenile Code. *In re Interest of Sir Messiah T. et al.*, 279 Neb. 900, 782 N.W.2d 320 (2010).

The record shows that despite the services provided to Jennifer, she has not been able to make any consistent progress toward correcting her parenting issues. Jennifer was uncooperative with her therapists and many of the workers who provided services to her, frequently claiming that various services were not useful or that she did not need them. Jennifer refused developmental disabilities services. Various individuals who worked with Jennifer explained parenting techniques to her multiple times, but her progress in applying the techniques she learned was limited. Family support workers raised concerns about Jennifer's engagement during visits and her failure to appropriately discipline her children. Jennifer did not see these issues as concerns or understand the purpose for the concern when it was brought to her attention. Jennifer was very resistant to many of the suggestions made to her with respect to her parenting. Jennifer's inconsistency was of particular concern with respect to Elijah, because of his behavior issues. Elijah's behaviors improved when his visits with Jennifer were less frequent. Finally, we note that James Jr. and Jayvion have been in foster care their entire lives and that during that time, Jennifer has not put herself in a position to be able to care for either James Jr. or Jayvion or their siblings. There is nothing in the record to indicate that permanency could be achieved with Jennifer anytime in the near future. To suspend the children in the system any longer than they already have been is not in their best interests.

A parent may as surely neglect a child of whom he or she does not have possession by failing to put himself or herself in a position to acquire possession as by not properly caring for a child of whom he or she does have possession. See *In re Interest of Elizabeth S.*, 282 Neb. 1015, 809 N.W.2d 495 (2012). Where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights. *In re Interest of Chloe C.*, 20 Neb. App. 787, 835 N.W.2d 758 (2013). The juvenile court did not err in finding that termination of Jennifer's parental rights to her minor children was in their best interests.

*Due Process.*

Jennifer asserts that the juvenile court erred by denying her due process through the trial judge's bias and impropriety.

The parent-child relationship is afforded due process protection, and consequently, procedural due process is applicable to a proceeding for termination of parental rights. *In re Interest of Antonio O. & Gisela O.*, 18 Neb. App. 449, 784 N.W.2d 457 (2010). When a person has a right to be heard, procedural due process includes notice to the person whose right is affected by a proceeding, that is, timely notice reasonably calculated to inform the person concerning the subject and issues involved in the proceeding; a reasonable opportunity to refute or defend against a charge or accusation; a reasonable opportunity to confront and cross-examine adverse witnesses and present evidence on the charge or accusation; representation by counsel, when such representation is required by constitution or statute; and a hearing before an impartial decisionmaker. *Id.* A party seeking to disqualify a judge on the basis of bias or prejudice bears the heavy burden of overcoming the presumption of judicial impartiality. *In re Interest of Jacob H. et al.*, 20 Neb. App. 680, 831 N.W.2d 347 (2013).

We first note that Jennifer did not move to disqualify the trial judge, object at the trial, or otherwise raise the issue of the judge's alleged bias or prejudice. A party is said to have waived his or her right to obtain a judge's disqualification when the alleged basis for the disqualification has been known to the party for some time, but the objection is raised well after the judge has participated in the proceedings. *Tierney v. Four H Land Co.*, 281 Neb. 658, 798 N.W.2d 586 (2011).

Even if Jennifer had preserved her allegation of bias or prejudice, we find no evidence of bias or prejudice in the record. In support of her assignment of error, Jennifer references certain statements made by the trial judge during her counsel's examinations of Vaughn and Barber. Jennifer argues that the judge did not allow for proper cross-examination of these witnesses. We do not set forth the details of those exchanges and comments here for the sake of brevity. However, we have carefully reviewed the passages from the bill of exceptions noted by Jennifer, and find no due process violation. When reviewed in context, the comments noted by Jennifer do not reveal bias or prejudice on the part of the trial judge and do not show that Jennifer was denied her ability to fully cross-examine Vaughn and Barber. This assignment of error is without merit.

## CONCLUSION

The juvenile court did not err by finding clear and convincing evidence of statutory grounds to terminate Jennifer's parental rights and by finding that termination was in the children's best interests. Jennifer was not denied her due process rights.

AFFIRMED.