Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
04/07/2016 12:08 PM CDT

In re Interest of Giavonna G., a child
under 18 years of age.
State of Nebraska, appellee, v.
Mario G., appellant.

___ N.W.2d ___

Filed March 29, 2016.    No. A-15-470.

1. **Juvenile Courts: Appeal and Error.** An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings.
2. **Parental Rights: Evidence: Appeal and Error.** If an appellate court determines that the lower court correctly found that termination of parental rights is appropriate under one of the statutory grounds set forth in Neb. Rev. Stat. § 43-292 (Cum. Supp. 2014), the appellate court need not further address the sufficiency of the evidence to support termination under any other statutory ground.
3. **Parental Rights.** Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity.
4. **Parental Rights: Words and Phrases.** A termination of parental rights is a final and complete severance of the child from the parent and removes the entire bundle of parental rights; therefore, with such severe and final consequences, parental rights should be terminated only in the absence of any reasonable alternative and as the last resort.
5. **Parental Rights: Parent and Child.** In considering a motion to terminate parental rights, the law does not require perfection of a parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child.

Appeal from the Separate Juvenile Court of Douglas County: Vernon Daniels, Judge. Reversed and remanded for further proceedings.

Anne E. Troia, P.C., L.L.O., for appellant.

Donald W. Kleine, Douglas County Attorney, Jennifer C. Clark, and Jocelyn Brasher, Senior Certified Law Student, for appellee.

Pirtle, Riedmann, and Bishop, Judges.

Pirtle, Judge.

## INTRODUCTION

Mario G. appeals the order of the separate juvenile court of Douglas County wherein the court found by clear and convincing evidence that it is in the best interests, safety, and welfare of the minor child, Giavonna G., to terminate Mario's parental rights. For the reasons that follow, we reverse, and remand for further proceedings.

## BACKGROUND

Heather F. is the mother of Tobias K., Ciela W., and Giavonna. This case began as an educational neglect case involving Tobias, Heather, and Tobias' father. A second amended petition was filed on February 14, 2013, adding allegations related to Giavonna. The petition alleged Giavonna came within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2008) because a caseworker had observed the family home "to be in a filthy, unwholesome manner, in that the basement was littered with cat feces, placing the children at risk for harm." Giavonna's father, Mario, did not live in the same residence as the children when they were removed. The caseworker's affidavit in support of removal reported that Mario had been charged with physically abusing Tobias on March 27, 2012.

On April 26, 2013, the juvenile court filed an order for immediate custody, finding that placement and detention was a matter of immediate and urgent necessity for the protection of the children. The order stated that placement shall exclude the homes of Heather, Ciela's father, and Mario. On the same

- 855 -

DECISIONS OF THE NEBRASKA COURT OF APPEALS
23 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF GIAVONNA G.
Cite as 23 Neb. App. 853

day, the State of Nebraska filed a third amended petition alleging Giavonna came within the meaning of § 43-247(3)(a) due to lack of proper parental care by reason of the faults or habits of her father, Mario. The petition alleged that Mario failed to provide safe, stable, and/or appropriate housing; that Mario failed to provide proper parental care, support, and supervision; and that Giavonna was at risk for harm.

Both Heather and Mario denied the allegations in the petition. On May 13, 2013, the court found that it was in Giavonna's best interests to remain in the care, custody, and control of the Nebraska Department of Health and Human Services (DHHS), to exclude the home of Mario. The court ordered that Mario have reasonable rights of supervised visitation and ordered him to provide certain medical history and information to DHHS, pay child support, and make reasonable efforts on his own to bring about rehabilitation.

On July 11, 2013, a fourth amended petition was filed alleging that Giavonna came within the meaning of § 43-247(3)(a) due to lack of proper parental care by reason of the faults or habits of Mario in that Mario failed to provide safe, stable, and/or appropriate housing for the child; that Mario failed to provide proper parental care, support, and supervision; and that due to the above allegations, Giavonna was at risk for harm.

In July 2013, an adjudication hearing with respect to the fourth amended petition was held. As of June 25, Mario was in arrears on his child support obligation for Giavonna in the amount of $1,327.92. The court ordered Mario to obtain safe, stable, and adequate housing; obtain a legal, stable source of income; have reasonable rights of supervised visitation as arranged by DHHS; and notify the court of any services he deemed necessary to assist with the return of Giavonna to the parental home.

At a hearing on September 10, 2013, Tara Kirkland, a family permanency specialist at Nebraska Families Collaborative (NFC), testified that Mario participated in visits, maintained

- 856 -

Decisions of the Nebraska Court of Appeals
23 Nebraska Appellate Reports
IN RE INTEREST OF GIAVONNA G.
Cite as 23 Neb. App. 853

housing and employment, and expressed a desire to have placement of Giavonna. She also testified that Mario did not want to participate in chemical dependency evaluations or urinalysis. The court ordered Mario to continue working on the objectives previously ordered in July and ordered him to complete a psychological evaluation as arranged by DHHS. The stated permanency objective for Giavonna was reunification with either parent.

A disposition hearing was held on November 5, 2013, and Mario's psychological evaluation was offered into evidence. The evaluation noted no significant concerns were present regarding Mario's parenting or parent-child interactions, but that he may benefit from interventions designed to assist him with developing skills to effectively cope with challenges and stressors presented in life. The evaluator also noted Mario was defensive throughout the evaluation process, and it was suggested that he may benefit from participating in parenting classes to strengthen his skills and prevent daily stressors from impacting his ability to successfully parent. The court's order noted the permanency objective for Giavonna was reunification with either parent, and Mario was ordered to participate in therapy and submit to baseline urinalysis. If the baseline was positive, he was ordered to submit to random urinalysis and undergo a chemical dependency evaluation by December 1. The court also ordered that if Mario fell asleep during visitation, then the visit would be terminated.

A review and permanency planning hearing was scheduled for, and took place on, May 5, 2014. Kirkland recommended that urinalysis be completed by Mario within 4 hours of the hearing, because testing was previously ordered, but not completed. She stated that NFC had "tried with three different agencies to get that service completed." The court ordered that the primary permanency objective for Giavonna be reunification with Mario, with a concurrent plan of adoption.

On August 4, 2014, the State filed a second motion for termination of parental rights alleging that Giavonna came

- 857 -

Decisions of the Nebraska Court of Appeals
23 Nebraska Appellate Reports
IN RE INTEREST OF GIAVONNA G.
Cite as 23 Neb. App. 853

within the meaning of Neb. Rev. Stat. § 43-292(2), (6), and (7) (Cum. Supp. 2014) and that termination of Mario's parental rights was in Giavonna's best interests. The petition specifically alleged Mario failed to consistently visit Giavonna; obtain and maintain safe, stable, and appropriate housing; consistently attend individual therapy; consistently submit to urinalysis testing, as requested by DHHS, in a timely manner; and utilize the services offered by NFC or DHHS in order to reunify with Giavonna.

On November 4, 2014, a review and permanency planning hearing was held. Kirkland informed the court that Mario was unsuccessfully discharged from family support, individual therapy, and urinalysis testing and had not completed a chemical dependency evaluation. She also stated that his attendance and visitation was less than 100 percent each month and that typically, he participated in only one of the two scheduled visits per week.

A hearing on the State's motion for termination was held on January 12, March 13, and April 27, 2015. Sherry Anderson, a program support worker at NFC, testified that she worked with Giavonna and Mario from April or May 2013 to February or March 2014. During that period, supervised visits were scheduled twice per week for a period of 3 hours. Initially, visits took place in the community, at either a restaurant or a park, if the weather permitted. The worker reported that the restaurant was not busy because the visits were held in the morning, that Mario allowed Giavonna to run around and play by herself, and that he sometimes chased her around the restaurant. Starting in January 2014, visits took place primarily in Mario's sister's home. Anderson testified that Giavonna spent a great deal of her time during visits playing with her cousin and that Anderson had to prompt Mario to interact with Giavonna. She stated that she had to prompt Mario to feed Giavonna and had to give reminders about taking Giavonna to the bathroom. The worker also reported that when Giavonna ate, she got messy, and that Mario did not

- 858 -

Decisions of the Nebraska Court of Appeals
23 Nebraska Appellate Reports
IN RE INTEREST OF GIAVONNA G.
Cite as 23 Neb. App. 853

wipe Giavonna's hands or face until he was prompted to do so by the worker.

In December 2013, Mario canceled three of his nine scheduled visits, and in January 2014, he canceled another two visits. Anderson did not have any safety concerns during visits, and she said it was clear that Giavonna and Mario cared for one another. In February, Mario requested a change in his visitation schedule so his older children could be present, and Anderson was transferred from the case because of her unavailability to handle the amended visitation schedule. In March, two visits were terminated early due to Mario's lack of supervision and general lack of attention to Giavonna.

Tamera F., Giavonna's maternal grandmother and foster mother, testified that Giavonna was placed in her home in April 2013. Giavonna did not return to the home of either parent at any time during this case. Tamera testified that initially Mario's visits were to occur three times per week for 4 hours, but the time and frequency were reduced to 2 days per week for 4 hours.

Tamera testified that she began potty training Giavonna 2 to 3 months after she came into her home and that Mario was unhappy with that decision because he had not given permission to begin potty training. Tamera testified that Mario would put diapers back on Giavonna and that it would set back Giavonna's progress. Tamera testified that she provided "pull-'em-ups" (diapers), wipes, shoes, socks, and change of clothes for Giavonna for visits, though she was told that the parent was supposed to provide items for the child's care and well-being. Tamera testified that on several occasions Giavonna would return from visits with Mario in someone else's clothing and that her underwear and jeans had feces on them. Tamera testified that on numerous occasions, Giavonna returned from visits with feces in her underwear, and that occasionally, it would be on her back, inside of her shirt, or inside of her jeans. These concerns were not reported by any of the workers who supervised visitation.

Tamera testified that she was concerned with the lack of supervision during visits with Mario. Giavonna returned from visits on occasion with food or candy on her, and on one occasion, with gum in her hair. Tamera testified that on another occasion, Giavonna came home with ink on her from her ankle to her trunk area. When asked, Giavonna stated that she had been in her cousin's room and had drawn on herself with a pen.

Kirkland, the family permanency specialist for NFC, testified that she became involved in this case in April 2013, prior to adjudication. Mario was initially allowed one visit per week, and he requested more frequent visits. Visits were increased to three times per week, and then adjusted down to two visits to accommodate Mario's work schedule. Kirkland testified that after visits were reduced from three times per week to two, Mario consistently attended until about February 2014. She said that from May 2014 to September 2014, Mario did not attend 100 percent of his scheduled visits in any month and was asked to "call and confirm" he would attend before each visit. Kirkland testified that during the period from May to September, he canceled one visit for a family graduation, one for a family emergency, "at least a handful" for work, and some because he failed to call to confirm the visit. At the time of trial, Mario was still receiving two fully supervised visits per week.

Kirkland testified that Mario participated in therapy, but his participation was not continuous. Kirkland received notice in November 2014 that Mario was not actively participating at that time, and he resumed therapy in February 2015. It was recommended that Mario participate in individual therapy, family therapy, and visits. No recommendations were made for Mario regarding chemical dependency treatment, because the evaluator did not have any accompanying urinalysis results to show what substances, if any, Mario was using at the time.

Kirkland testified that Mario was ordered to do a baseline urinalysis in November 2013 but it was not actually completed until June 17, 2014. The initial urinalysis testing was to be performed by a family services company, but the company was not able to obtain a sample and its services were discontinued in December 2013. Another company also attempted to obtain a baseline and discontinued its services when they were unsuccessful. A third company actually obtained the baseline in June 2014, but was unable to obtain any further urinalyses and discontinued its services. A laboratory report in July confirmed the presence of marijuana in Mario's sample, and he was ordered to submit to two urinalyses per month, but only one sample was given, in February 2015. The sample in February was also positive for marijuana.

Kirkland testified that when she began working with Mario, he did not have his own residence. Mario lived with his aunt and uncle, and he obtained independent housing in December 2014. Kirkland testified that she did not believe Mario made progress throughout this case. He consistently stated that he did not know why he was a part of this case, that the services did not make sense, and that anyone who thought he needed therapy also needed therapy. Kirkland testified that Mario told her he did not have time to participate in services because he needed to work to pay child support for Giavonna and his two other children.

Kirkland testified that support workers raised concerns regarding Mario's level of supervision during visits, lack of preparation with supplies, and choice of foods to provide for Giavonna during visits. She testified that in her opinion, based on her work with the family and her training and experience, it was in Giavonna's best interests to terminate Mario's parental rights. She also based her opinion on his unwillingness to follow through with completion of services and the fact that "visits have not always been completely positive." She stated Giavonna was not getting the kind of consistency she needed because visits were frequently canceled.

She testified that Mario was able to provide for Giavonna's physical needs, but her concern was providing for Giavonna's emotional needs.

Stephanie Gorman, a family advocate, testified that her duties include supervising visits, ensuring the safety of the child, and making sure the child is fed and his or her interests are met. The child's interests include parental engagement and participation in activities that are appropriate for the child's age. She supervised visits between Giavonna and Mario, and she testified that during the four visits she attended between October and December 2014, the majority of Giavonna's interactions during visits were with her cousins. She observed that Mario has a large, extended family and that Giavonna is close with her family members. She estimated Giavonna's cousins interacted with her approximately 70 percent of the time, and Mario was often on the couch in the family room, watching television. Gorman testified that Mario fell asleep twice during visits and that she woke him to remind him this behavior was not appropriate. Gorman also observed that Mario loved Giavonna and kissed and hugged her often.

Steve Wendell is a licensed mental health practitioner in Nebraska. Giavonna and Mario were referred to him in February 2015 to aid in reunification. Mario told Wendell that he was looking for support for Giavonna for emotional issues related to separation and foster placement. Wendell testified that he planned to have weekly therapy with Giavonna and Mario utilizing "Parent Child Interaction Therapy" (PCIT). Wendell said PCIT is used to teach parents effective ways of interacting with a child to have a better relationship and to enforce compliance with parents' rules and representations. Wendell testified that Mario expressed reservations about participating in this type of treatment. He said Mario was respectful and cooperative, and showed up on time, but he talked to Wendell in great length about why he did not feel he needed this type of training, because he was already raising two other children. Wendell testified that he was not optimistic that

- 862 -

DECISIONS OF THE NEBRASKA COURT OF APPEALS
23 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF GIAVONNA G.
Cite as 23 Neb. App. 853

Mario would make improvements in parenting if he continued to resist the therapeutic techniques. He said that improvement was within Mario's control and that he had the ability to do quite well if he made the necessary changes.

Shane Powers, Kim Minadeo, and Amanda Garver each provided family support as employees of a counseling and consulting company. As coverage workers, they each supervised a limited number of visits between Giavonna and Mario. Powers testified that during the two visits he supervised, Giavonna and Mario appeared to be affectionate toward one another and he did not observe any safety concerns. Minadeo testified that she supervised one visit, at Mario's home, in February 2015. She said Giavonna and Mario appeared excited to see one another, the home was clean, and there were no safety concerns. Garver testified that she served as the coverage worker for two visits between Giavonna and Mario. Garver testified that the home appeared appropriate, Giavonna and Mario interacted appropriately, and there were no safety concerns.

Krystal Frost is a family support worker for the same counseling and consulting company. She began working with Giavonna and Mario as a temporary worker in February 2015, and she eventually became the permanent visitation worker. She testified that on Mondays, Giavonna was picked up at 11 a.m. and dropped off after the visit at 2 p.m., so visits lasted from approximately 11:30 a.m. to 1:30 p.m. She testified that on more than one occasion, a visit was canceled because Giavonna did not want to go, even though she was encouraged to attend by her foster mother. Frost testified that it was her understanding Mario was to implement PCIT techniques during visits, but that she believed he was not doing so. She testified that she questioned Mario on this issue and that he responded he was not going to do it.

The guardian ad litem involved in this case stated that she did not believe the evidence presented supported continued contact. She expressed concern for the length of time

Giavonna had been in out-of-home placement, the inconsistency of visits, and Giavonna's resistance to attending some visits.

In its order filed May 8, 2015, the juvenile court terminated Mario's parental rights pursuant to § 43-292(2), (6), and (7) and found that termination was in Giavonna's best interests. The court sustained Mario's motion for continued visitation with Giavonna pending any appeals in this matter.

## ASSIGNMENTS OF ERROR

Mario asserts the juvenile court erred in finding that the State proved by clear and convincing evidence that there were statutory grounds to terminate Mario's parental rights under § 43-292(2) and that termination was in Giavonna's best interests.

## STANDARD OF REVIEW

[1] An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Chloe C.*, 20 Neb. App. 787, 835 N.W.2d 758 (2013).

## ANALYSIS

*Statutory Grounds for Termination.*

In the Nebraska statutes, the bases for termination of parental rights are codified in § 43-292. Section 43-292 provides 11 separate conditions, any one of which can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child. *In re Interest of Sir Messiah T. et al.*, 279 Neb. 900, 782 N.W.2d 320 (2010).

In its order terminating Mario's parental rights to Giavonna, the juvenile court found that Mario substantially and continuously neglected to give the child necessary parental care and protection (§ 43-292(2)), that reasonable efforts failed to correct the condition which led to the adjudication (§ 43-292(6)),

- 864 -

Decisions of the Nebraska Court of Appeals
23 Nebraska Appellate Reports
IN RE INTEREST OF GIAVONNA G.
Cite as 23 Neb. App. 853

and that the child had been in an out-of-home placement for 15 or more of the most recent 22 months (§ 43-292(7)).

Mario does not contest the juvenile court's finding that grounds for terminating his parental rights existed under subsections (6) and (7) of § 43-292; he asserts only that the State failed to prove by clear and convincing evidence that he substantially and repeatedly neglected and refused to give Giavonna necessary parental care and protection, as required by subsection (2).

[2] If an appellate court determines that the lower court correctly found that termination of parental rights is appropriate under one of the statutory grounds set forth in § 43-292, the appellate court need not further address the sufficiency of the evidence to support termination under any other statutory ground. *In re Interest of Chloe C., supra*.

Giavonna was removed from parental care in April 2013. She was placed in foster care, and she was not returned to either Heather's or Mario's care at any time prior to the filing of the State's motion for termination of Mario's parental rights on August 4, 2014. Our review of the record clearly and convincingly shows that Giavonna had been in an out-of-home placement for 15 of the most recent 22 months and that grounds for termination of Mario's rights under § 43-292(7) were proved by sufficient evidence. This court need not review the statutory grounds for termination under § 43-292(2) or (6). Once a statutory basis for termination has been proved, the next inquiry is whether termination is in the child's best interests.

*Best Interests.*

Mario asserts there was not clear and convincing evidence that termination of his parental rights was in Giavonna's best interests. Specifically, Mario argues that he has maintained monthly contact with the case manager, obtained and maintained safe and appropriate housing, and provided love and support for all of his children, including Giavonna. He also

- 865 -

Decisions of the Nebraska Court of Appeals
23 Nebraska Appellate Reports
IN RE INTEREST OF GIAVONNA G.
Cite as 23 Neb. App. 853

asserts that he demonstrated an improvement in his parenting skills and that a strong bond exists between him and Giavonna. He asserts that his only fault was in failing to promptly comply with court orders.

[3] Nebraska courts have recognized that children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Octavio B. et al.*, 290 Neb. 589, 861 N.W.2d 415 (2015). Kirkland, the family permanency specialist involved in this case, testified that she did not believe Mario made progress and that based on her work with the family, and her training and experience, it was her opinion that it was in Giavonna's best interests to terminate Mario's parental rights.

When Giavonna was removed from Heather's home, Mario was not able to take placement of her, because he was not able to provide safe, stable, and appropriate housing. The record is clear that Giavonna was removed from Heather's care in February 2013, and she had been in out-of-home placement for the statutory period defined in § 43-292(7). The State's third amended petition contained allegations related to Mario, but the juvenile court did not find Giavonna to be a child within the meaning of § 43-247(3)(a) insofar as Mario was concerned until July 2013. The time that elapsed between that determination and the State's second motion for termination of Mario's parental rights in August 2014 was slightly over 1 year.

During that year, Mario demonstrated improvement in some areas, but achieved less success in others. In July 2013, Mario did not have his own residence and was living with his aunt and uncle. He obtained independent housing in December 2014, though this was not achieved until after the second motion for termination of parental rights was filed. He maintained a stable job throughout this case and built and maintained an affectionate relationship with Giavonna that was observed by multiple support workers. He also expressed and

- 866 -

Decisions of the Nebraska Court of Appeals
23 Nebraska Appellate Reports
IN RE INTEREST OF GIAVONNA G.
Cite as 23 Neb. App. 853

demonstrated a desire for Giavonna to develop a bond with her siblings and extended family.

He was unsuccessfully discharged from urinalysis testing for failure to complete the ordered urinalysis testing through multiple testing services. He also participated in PCIT training, but failed to fully incorporate this training into his interactions with Giavonna. Wendell testified that Mario was respectful and cooperative, but that Mario expressed reservations about utilizing PCIT techniques in parenting Giavonna. Wendell testified that Mario had the ability to do quite well if he committed to making the necessary changes, but that he was not optimistic that Mario's parenting would improve if he resisted the therapeutic techniques. We note that Mario's psychological evaluation did not contain any significant concerns regarding his parenting or parent-child interactions; the evaluation merely suggested that he may benefit from interventions designed to assist him with developing skills to cope with challenges and stressors.

The record clearly demonstrates that Mario did not have perfect attendance for visits with Giavonna throughout this case, and Kirkland testified that support workers raised concerns regarding Mario's level of supervision during visits, lack of preparation with supplies, and choice of foods to provide during visits. When Mario first became involved in this case, visits took place in a public place or at his sister's home and his attendance fluctuated. Kirkland testified that he attended consistently between winter 2013 and February 2014. However, she testified that from May to September 2014, he canceled multiple visits due to work commitments, family emergencies or events, and occasionally failure to call to confirm whether he would attend.

Kirkland testified that Mario was able to provide for Giavonna's physical needs, but that her concern was his ability to provide for Giavonna's emotional needs. Gorman supervised four visits between October and December 2014 and reported that Mario appeared to have a big extended family

- 867 -

Decisions of the Nebraska Court of Appeals
23 Nebraska Appellate Reports
IN RE INTEREST OF GIAVONNA G.
Cite as 23 Neb. App. 853

and that Giavonna was close to her cousins. She observed that Mario loved Giavonna and showed his affection for her often. Powers, Minadeo, Garver, and Frost prepared session notes following supervised visits during the period from February to April 2015. These notes indicate Mario was making progress. The workers indicated that visits were happening regularly and that Mario provided appropriate affection, food, entertainment, and discipline during visits. The session notes did not indicate there were safety concerns in the home during that time period, except on one occasion when Frost noted that she had to redirect a conversation when Giavonna asked Mario about something she had heard about him from her grandmother. Powers, Minadeo, and Garver testified that Giavonna and Mario appeared excited to see each other during visits and were affectionate toward each other.

[4,5] A termination of parental rights is a final and complete severance of the child from the parent and removes the entire bundle of parental rights; therefore, with such severe and final consequences, parental rights should be terminated only in the absence of any reasonable alternative and as the last resort. *In re Interest of Justin H. et al.*, 18 Neb. App. 718, 791 N.W.2d 65 (2010). In considering a motion to terminate parental rights, the law does not require perfection of a parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child. See *In re Interest of Athina M.*, 21 Neb. App. 624, 842 N.W.2d 159 (2014).

Upon our de novo review, we conclude that while this case is a "close call," Mario's assertions do have merit. We fully recognize that Mario has made improvement but still has work to do before achieving reunification with Giavonna. In particular, we point to the need for Mario to demonstrate the ability to maintain sobriety and stability in visitation, and to comply promptly with any applicable court orders. However, as stated above, we do not require perfection of a parent when deciding whether termination of parental rights is

- 868 -

DECISIONS OF THE NEBRASKA COURT OF APPEALS
23 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF GIAVONNA G.
Cite as 23 Neb. App. 853

appropriate. See *In re Interest of Seth K. & Dinah K.*, 22 Neb. App. 349, 853 N.W.2d 217 (2014). We find there was not clear and convincing evidence to demonstrate that terminating Mario's parental rights was in Giavonna's best interests at the time of trial. As such, we reverse the juvenile court's order terminating Mario's parental rights.

## CONCLUSION

We find that the juvenile court erred when it found that the State had proved, by clear and convincing evidence, that terminating Mario's parental rights would be in Giavonna's best interests. Accordingly, we reverse the order of the juvenile court terminating his parental rights and remand the matter for further proceedings.

REVERSED AND REMANDED FOR
FURTHER PROCEEDINGS.