IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF ANTONIO J. ET AL.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF ANTONIO J., ET AL.,
CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

ANTONY J., APPELLANT, AND CORDELL S. AND SAMONA J., APPELLEES.

Filed December 26, 2017.    No. A-17-317.

Appeal from the Separate Juvenile Court of Douglas County: DOUGLAS F. JOHNSON, Judge. Affirmed.

Anne E. Troia, P.C., L.L.O., for appellant.

Donald W. Kleine, Douglas County Attorney, and Jennifer C. Clark for appellee State of Nebraska.

Darren J. Pekny and Courtney R. Ruwe, of Johnson & Pekny, L.L.C., for appellee Cordell S.

Thomas C. Riley, Douglas County Public Defender, and Claudia L. McKnight for appellee Samona J.

Monica Green Kruger, guardian ad litem.

PIRTLE, RIEDMANN, and ARTERBURN, Judges.

PIRTLE, Judge.

## I. INTRODUCTION

The separate juvenile court of Douglas County terminated the parental rights of three individuals, Antony J., Cordell S., and Samona J., on March 10, 2017. Antony J. appeals from the order that terminated his parental rights to five children. Cordell S. appeals from the order that terminated his parental rights to one child. Samona J. appeals from the order that terminated her parental rights to 11 children, including the children of Antony and Cordell. Based on the reasons that follow, we affirm the orders which terminated the parties' parental rights to their respective children.

## II. BACKGROUND

Antony and Samona are the biological parents of Tania, born in August 2003; Antonio, born in November 2004; Quaronn, born in December 2005; Kobe, born in May 2007; and Samaya, born in August 2010. Samona and Cordell are the biological parents of Naudia, born in June 2001. Samona is also the biological mother of Kirayle, born in December 1998; Daveon, born in January 2000; Jordyn, born in December 2012; Nia, born in December 2013; and Kendrick, born in November 2015.

On December 10, 2012, the State filed a petition alleging educational neglect of Naudia and Antonio. Samona was the only parent whose name appeared in the petition. Cordell filed a complaint to intervene on March 26, 2013. On May 6, Samona admitted to the allegations that the children were each absent from school approximately 20 days during the 2011-12 school year, that she failed to actively assist the children in attending, and that she failed to work with school authorities. She admitted that due to these allegations, the children were at risk for harm. The children were found to be within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Supp. 2013) by a preponderance of the evidence. The court ordered the children to remain in the temporary custody of DHHS for appropriate care and placement to include Samona's home.

On November 15, 2013, the State filed a motion for temporary custody and an affidavit for removal of Antonio, Quaronn, Kobe, Samaya, Deveon, Kirayle, Tania, Naudia, and Jordyn from the parental home. The State also filed a supplemental petition alleging Samona had subjected one of the children to excessive physical discipline or contact and failed to provide proper parental care, support, and/or supervision to all of her children, and the children were at risk for harm. An order was entered removing the minor children from Samona's care.

A protective custody hearing was held on November 25, 2013, and the court found the State met its burden of showing that there was probable cause that the children were within the meaning of § 43-247(3)(a). The court specifically found that Samona's physical abuse of a minor child caused dental damage, as she pushed one child's head into the floor and the incident "is consistent with the mother's overall lack of adequate parenting for the children." The court referenced a prior existing docket regarding Kameron, in which the court found that no further reasonable efforts were required for reunification with Samona, as she failed to participate in his life and support his placement at Boys Town. The court ordered the children to remain outside of

Samona's home and stated that further reasonable efforts would be provided for possible reunification.

Antony filed a complaint to intervene on December 4, 2013. He was permitted to intervene.

A second supplemental petition was filed on December 19, 2013, following the birth of Samona's daughter, Nia. The petition alleged Samona had subjected one or more of the children to inappropriate physical discipline; failed to provide proper parental care, support and/or supervision, and Nia was at risk for harm because she has significant birth defects and Samona was unable to adequately provide for her medical needs.

In January 2014, the court temporarily suspended Samona's supervised visits with the children after workers reported that she acted inappropriately during visits, making comments to the children that they had been kidnapped. Workers reported that Samona instructed the children to be disrespectful to visitation workers and their foster parents, that she encouraged them to run away from foster care, and to run in all directions at the conclusion of the visit so workers could not return them to their foster homes. On February 4, the court ordered the supervised visits to resume.

At a hearing on May 12, 2014, Samona admitted to Counts I, II-B, and II-C of the supplemental petition, and I, II-B, and II-D of the second supplemental petition, thereby admitting that the children resided in Douglas County, that she had failed to provide proper parental care and/or supervision the children and, due to these allegations, the children were at risk for harm. The court dismissed the remaining allegations in the supplemental petition and second supplemental petition on the oral motion of the State.

Various rehabilitation plans were adopted by the court during the pendency of this case. The plans were mainly focused on services provided to the children and services Samona was ordered to participate in. However, as the fathers became involved, specific orders were made regarding their participation as well. For example, after a review and disposition hearing on August 12, 2014, the court ordered that Antony be provided with semi-supervised family time with Antonio, Quaronn, Kobe, Samaya, and Tania. The order following the January 22, 2015, hearing ordered Antony to provide safe, stable, and adequate housing for his children.

On October 26, 2015, the State filed a motion for termination of Samona's parental rights, alleging that the children came within the meaning of Neb. Rev. Stat. § 43-292(2), (6), and (7) (Reissue 2016), and that termination of her parental rights was in the children's best interests.

On October 27, 2015, the State filed a fourth supplemental petition and termination of parental rights alleging Antonio, Quaronn, Kobe, Samaya, and Tania came within the meaning of § 43-247(3)(a) (Supp. 2015) due to the faults or habits of Antony, in that (A) he failed to demonstrate appropriate parenting during visits; (B) he failed to provide proper parental care, support, and/or supervision; (C) he failed to provide safe, stable, and appropriate housing; and (D) due to these allegations, the children were at risk for harm. The petition also alleged that the children were within the meaning of § 43-292(2) and (7), and that termination of his parental rights was in the children's best interests.

A protective custody hearing was held on November 4, 2015, in which Antony denied the allegations in the State's petition. It was ordered that Antony was "invited to" participate in visitation; work with a parenting coach to learn appropriate responses to the ages and stages of development; participate in family therapy; work with a family support worker for assistance with

housing and a legal source of income; participate in educational appointments, medical and dental care; undergo random drug testing and an initial diagnostic interview and substance abuse evaluation; participate in a trauma informed service; and undergo relinquishment counseling.

The State filed a sixth supplemental petition and termination of parental rights alleging Naudia came within the meaning of § 43-247(3)(a) due to the faults or habits of Cordell, in that (A) he failed to provide proper parental care and support; (B) he failed to provide safe, stable and appropriate housing; (C) he failed to have any contact with the child within the previous 6 months; (D) he failed to provide emotional support in the previous 6 months; (E) he failed to provide financial support in the previous 6 months; (F) he failed to place himself in a position to parent Naudia; and (G) due to these allegations, she is at risk for harm. The petition also alleged that the child was within the meaning of § 43-292(1),(2),(7), and (9), and that termination of Cordell's parental rights was in the child's best interests. The petition alleged reasonable efforts were not required because Cordell subjected her to aggravated circumstances including, but not limited to, abandonment, torture, chronic abuse, or sexual abuse.

Kendrick was born in November 2015, and a motion and affidavit for immediate removal from Samona's care was filed on December 9. On the same day, the State filed an eighth supplemental petition and termination of parental rights alleging that Kendrick came within the meaning of § 43-247(3)(a) due to the faults or habits of Samona in that (A) Antonio, Quaronn, Kobe, Samaya, Daveon, Kirayle, Tania, Naudia, Jordyn, and Nia had been in foster care for over 2 years; (B) Samona failed to progress past fully supervised visitation with the other children despite reasonable efforts being provided; (C) Samona failed to adhere to the safety plan she agreed to; (D) Samona failed to provide proper parental care, support, and/or supervision; and (E) due to these allegations Kendrick was at risk for harm. The State alleged Kendrick came within the meaning of § 43-292(2) and that termination of Samona's parental rights was in his best interests.

Adjudication of the fourth, sixth, and eighth supplemental petitions was held on March 31, April 1, April 21 and 22, May 16, May 24, October 17 and 18, November 28, 2016, and January 11, 2017. On March 10, the court issued three separate orders finding that all counts in the relevant supplemental petitions were true by clear and convincing evidence and ordering that the parental rights of Samona, Antony, and Cordell be terminated.

Further relevant facts will be detailed in connection with the discussion of each assignment of error.

## III. ASSIGNMENTS OF ERROR

Antony assigns that the juvenile court erred in finding (1) that the State proved by clear and convincing evidence that his children came within the meaning of § 43-292(2) and (2) that the State proved by clear and convincing evidence that termination of his parental rights was in the children's best interests.

Samona assigns that the juvenile court erred in finding the State proved by clear and convincing evidence that termination of her parental rights was in the children's best interests.

Cordell cross-appeals, assigning that the juvenile court erred in finding the State proved by clear and convincing evidence that termination of his parental rights was in the child's best interests.

## IV. STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Nicole M.*, 287 Neb. 685, 844 N.W.2d 65 (2014).

## V. ANALYSIS

### 1. TERMINATION OF ANTONY'S PARENTAL RIGHTS

#### (a) Statutory Grounds for Termination

In the Nebraska statutes, the bases for termination of parental rights are codified in § 43-292, which provides 11 separate conditions, any one of which can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child. *In re Interest of Giavonna G.*, 23 Neb. App. 853, 876 N.W.2d 422 (2016).

In its order terminating Antony's parental rights to Antonio, Quaronn, Kobe, Samaya, and Tania, the juvenile court found that the State showed by clear and convincing evidence that he substantially and continuously or repeatedly neglected and refused to give the children necessary parental care and protection (§ 43-292(2)), and that the children had been in an-out-of-home placement for 15 or more of the most recent 22 months (§ 43-292(7)).

Antony does not contest the juvenile court's finding that grounds for terminating his parental rights existed under § 43-292(7); he asserts only that the State failed to prove by clear and convincing evidence that he substantially and repeatedly refused to give the children necessary parental care and protection, as required by § 43-292(2).

If an appellate court determines that the lower court correctly found that termination of parental rights is appropriate under one of the statutory grounds set forth in § 43-292, the appellate court need not further address the sufficiency of the evidence to support termination under any other statutory ground. *In re Interest of Chloe C.,* 20 Neb. App. 787, 835 N.W.2d 758 (2013).

Antonio, Quaronn, Kobe, Samaya and Tania were removed from parental care in November 2013 and they did not return to either parent's care at any time prior to the filing of the State's motions for termination of Antony's parental rights on October 27, 2015. Our review of the record clearly and convincingly shows that the children had been in out-of-home placement for 15 or more of the most recent 22 months and that grounds for termination of Antony's parental rights under § 43-292(7) were proved by sufficient evidence. This court need not review the statutory grounds for termination under § 43-292(2). Once a statutory basis for termination has been proved, the next inquiry is whether termination is in the children's best interests.

#### (b) Best Interests

Antony asserts the juvenile court erred in finding there was clear and convincing evidence that termination of his parental rights was in the children's best interests. Specifically, he argues that he intervened in this case and has committed to improving his parenting skills. He argues that he used a "minimal amount of physical discipline toward Antonio and Tania" during a "limited number" of visits and the court relied heavily on this, dismissing the loving interactions he had with Quaronn, Kobe, and Samaya. Brief for appellant at 15.

The overriding legal framework is well settled. A child's best interests are presumed to be served by having a relationship with his or her parent. *In re Interest of Alec S.*, 294 Neb. 784, 884 N.W.2d 701 (2016). This presumption is overcome only when the State has proved that the parent is unfit. *Id.* In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being. *Id.* The best interests analysis and the parental fitness analysis are separate inquiries, but each examines essentially the same underlying facts as the other. *Id.*

The evidence demonstrates that Antony is unfit and that termination of his parental rights is in the children's best interests.

At the time the State filed the fourth supplemental petition and termination of Antony's parental rights, the State also filed an ex parte motion for immediate custody with an affidavit for custody and removal. The affidavit alleged that four of the children have had significant behavioral problems in the school setting and the children need a "structured and stable environment that is able to promote accountability, consistency and responsibility." It was alleged that an active caregiver must be able to provide adequate housing, transportation, and maintain regular and frequent contact with school officials. The affidavit alleged Antony had secured housing as of March or April 2015, but he lived in a one bedroom apartment that would not be adequate for himself and five children. The State alleged that Antony had regular, fully supervised visits with the children and he was observed using physical discipline on a child on two separate occasions.

Following a protective custody hearing on November 4, 2015, the court found that there was probable cause that the minor children were within the meaning of § 43-247(3)(a) due to the faults or habits of Antony. The court found that Antony was up-to-date with his child support payments, but provided no additional support for the children, and that during supervised visitation, Anthony used inappropriate physical discipline to manage the behavior of the children. The court found the children could not be placed in Antony's care at that time, because he failed to meet their educational, emotional, mental health, and physical needs.

The children have been in foster care since November 2013 and have never lived with Antony. At the time of trial, he had not provided information to family permanency specialists to verify the amount of his income, or that he had sufficient income to support and provide for five children. He received disability benefits that were estimated to be approximately $650, and there was some indication that he was doing "under the table odd jobs." However, these "odd jobs" were not viewed by case specialists as a reliable source of income. He lived in a one-bedroom apartment that did not have adequate space for five children.

Visitation workers testified that they observed Antony using inappropriate physical discipline toward the children during supervised visitation. The affidavit for custody and removal alleged that in June 2015, Antony attempted to hit Tania in the mouth for using curse words, and in July 2015, Antonio was not listening to Antony toward the end of a visit, so Antony removed his belt and struck the child on the rear end. Joseph Doherty, a visitation worker, testified that he witnessed this incident. While Doherty transported Antonio to his foster home, Antonio cried, his behavior and mood changed, and he became very hostile toward Doherty. Doherty filed a critical incident report with the Department of Health and Human Services.

Lillian Chaparro testified that on one occasion in March 2016, a verbal disagreement with Tania escalated and Antony grabbed Tania by the arm and neck. Chaparro reported the incident, stating that Antony threw the child over his shoulder and then placed her onto the ground "pretty hard." Heather Bermel testified that during one visit Antony confronted Tania about giving his girlfriend's number to her mother, and the discussion escalated to the point that Antony was yelling at Tania. Tania became upset and walked out of the apartment and the police had to be called to help find her. Bermel testified that Antony seemed unaffected by Tania's departure. In December 2016, another visitation worker, Patrick Sneckenberg, saw Antony slap Antonio in the face after Antonio made a comment to him at the conclusion of a visit. There were also concerns raised by a visitation worker that during a visit, Antony's speech was slurred and he appeared to be under the influence of drugs or alcohol.

Kawanda Brown, a family permanency specialist, testified that she discussed the use of physical discipline with Antony, and he informed her that he believed that he should be able to use physical discipline if the children's behaviors required it.

Bethany Dilts, a family permanency specialist, began working with the family in May 2015. Dilts testified that Antony felt that discipline should be up to the parent and that there should not be any sort of restriction on how the parent chooses to discipline a child. He told Dilts that he should be able to spank or hit his children if they need it. She testified that Antony's visits with the children remained fully supervised, and in her opinion, the visits should remain fully supervised due to concerns regarding his ability to manage his children's behaviors and to use appropriate discipline.

The record shows that Antony attended some of the children's educational appointments, but he did not attend medical appointments. Services were provided to Antony including family support, visitation, drug testing, and an Initial Diagnostic Interview (IDI). He did not agree to complete the IDI or participate in drug testing. He was resistant to working with family support, but eventually agreed to work with them on housing and improving his parenting skills, specifically learning appropriate discipline techniques. However, Dilts testified that, in her opinion, Antony did not make enough progress to have the children placed in his care, despite the services provided.

Further, the evidence shows that Antony is unwilling or unable to provide adequate support for the children's behavioral and mental health. Antony has not participated in family therapy or attended the children's psychiatric appointments and has not been sympathetic to addressing his children's mental health needs. In a report prepared by Brown in March 2015, she expressed concern regarding Antony's ability to effectively manage the behaviors of five children, if placed, as four of the children have high behavioral and educational needs that require stability, structure, and consistency with medication and psychiatric appointments." She testified regarding those same concerns in April 2016, as well as her concerns that Antony would be unable to provide a home with adequate space and enough income to support five children.

Antonio was prescribed two medications for management of oppositional defiance disorder and ADHD and sees an individual therapist. At the hearing on November 28, 2016, Dilts testified that Antonio longer required medication to manage his ADHD. Quaronn was diagnosed with ADHD combined with oppositional defiance disorder. He participates in individual therapy and was prescribed a medication for management of his ADHD symptoms. Quaronn's principal

testified that he was placed on medication during his third grade year and his behavior at school improved significantly in fourth grade. Kobe was diagnosed with adjustment disorder and participates in individual therapy to address goals of managing and expressing his feelings and in dealing with grief associated with being out of his mother's home. Kobe's principal testified that his behavior at school improved "drastically" after he began taking medication for ADHD in the fall of 2015. Tania sees a counselor to address goals of managing her emotions and communicating her feelings when she is overwhelmed or upset.

The evidence shows Antony was not supportive of his children taking prescribed psychotropic medications. Brown testified that she spoke to Antony about giving medication as prescribed if the time to take the medication fell within a visit. Antony was "very vocal" about not wanting to give Quaronn his medication, stating that he did not believe that medication was necessary and he does not want his children on "cray-cray pills."

Dilts testified that, in her opinion, it would be in the best interests of the children to terminate his parental rights because these children have "very high needs" and he is unable to meet them. She stated that he does not place a high priority on their needs and he does not have the foundation necessary to meet their needs. She testified that she had concerns regarding his ability to provide financial support for the children and his ability to parent due to the fact that he has never parented his children alone. She also expressed concern that he has a prior conviction for sexual assault of a child, which would potentially put his children at risk for harm.

Brown testified that at the time she was transferred from this case in May 2015, Antony had not made sufficient progress for the children to be placed in his home. She stated her opinion that termination of Antony's parental rights was in the children's best interests because they deserved stability, consistency, and the chance to have a "normal kid life."

Nebraska courts have recognized that children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Octavio B. et al.,* 290 Neb. 589, 861 N.W.2d 415 (2015). The law does not require perfection of a parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child. See *In re Interest of Athina M.*, 21 Neb. App. 624, 824 N.W.2d 159 (2014). Although there was some evidence that Antony established bonds with the children, some stronger than others, Anthony has not made continued improvement in his parenting skills, and has not demonstrated the ability to provide for the children financially, or the ability to support the children's emotional, educational, mental health, and behavioral needs. In addition, Antony's continued use of physical discipline, after being told that such discipline is inappropriate, contributes to a finding that he is unfit to parent these children.

Upon our de novo review, we find that the State proved by clear and convincing evidence that termination of Antony's parental rights is in the children's best interests.

## 2. TERMINATION OF SAMONA'S PARENTAL RIGHTS

Before addressing Samona's assignment of error, we first must discuss the chronology of the appeal in this case. Antony filed a notice of appeal on March 23, 2017. Samona and Cordell each filed a notice of appeal on April 7. In response to their notices of appeal, the clerk of the Nebraska Supreme Court sent letters to the Separate Juvenile Court for Douglas County and copied all attorneys of record, advising them that pursuant to Neb. Ct. R. App. P. § 2-101(C) (rev. 2010),

multiple appeals from the same case could not be docketed. The clerk advised, "Therefore, the notice of appeal filed by [Samona] shall be treated as a second notice of appeal in the above-captioned matter." This is in accord with § 2-101(C), which states:

> Method of Docketing Case; Multiple Appeals from Same Case Prohibited. Upon receipt of the material required by § 2-101(B), the Clerk of the Supreme Court shall thereupon docket the case designating the party or parties first having filed the notice of appeal in the district court as appellant or appellants. All other parties shall be designated as appellees, and any attempt to appeal thereafter made by any party to the action shall be filed in the existing case and not separately docketed.

Antony filed a "Brief of Appellant" on June 16, 2017. Samona filed a brief on July 11, identifying herself as "Appellee-Samona [J.]." Cordell filed a "Brief of Appellee/Cross-Appellant-Cordell [S.]" on August 2. The State filed a "Brief of Appellee" on September 7, and a "Brief of Appellee/Guardian Ad Litem" was filed on August 31. No further briefing occurred.

In her brief, Samona assigned error and sought affirmative relief, but there is no designation of a cross-appeal on the cover of her brief, nor is a cross-appeal set forth in a separate division of the brief as required by Neb. Ct. R. App. P. § 2-109(D)(4) (rev. 2012), which states in full:

> Where the brief of appellee presents a cross-appeal, it shall be noted on the cover of the brief and it shall be set forth in a separate division of the brief. The division shall be headed "Brief on Cross-Appeal" and shall be prepared in the same manner and under the same rules as the brief of appellant.

In *In re Interest of Natasha H. & Sierra H.*, 258 Neb. 131, 602 N.W.2d 439 (1999), the Nebraska Supreme Court declined to consider a father's arguments appealing the termination of his parental rights, because he failed to properly designate his arguments as a cross-appeal. The father filed a notice of appeal after the mother did so, making him an appellee. The father set forth assignments of error in his brief, which he simply titled "Brief of Appellee." *Id.* at 144, 602 N.W.2d at 450. In its refusal to consider the father's assignments of error, the court explained that the appellate courts of this state "have always refused to consider a prayer for affirmative relief where such a claim is raised in a brief designated as that of an appellee," *id.* at 146, 602 N.W.2d at 451, and "have repeatedly indicated that a cross-appeal must be properly designated pursuant to [§ 2-10]9(D)(4), if affirmative relief is to be obtained." *Id.* at 145, 602 N.W.2d at 450. The court further cautioned parties seeking affirmative review of their claims to be aware of the rules governing appeals, noting that "[a]ny party who fails to properly identify and present its claim does so at its peril." *Id.* at 147, 602 N.W.2d at 451. See, also, *In re Interest of Chloe P.*, 21 Neb. App. 456, 840 N.W.2d 549 (2013).

In the present case, after Samona filed her notice of appeal, the appellate clerk notified her that her notice of appeal would be treated as a second notice of appeal and referred her to § 2-101(C). This rule advised Samona that she would be designated as an appellee, and she correctly designated herself as an appellee on her brief. However, Samona failed to comply with the proper filing of a cross-appeal. Section 2-101(E) instructs an appellee on how to assert a cross appeal, stating: "Cross-Appeal. The proper filing of an appeal shall vest in an appellee the right to

cross-appeal against any other party to the appeal. The cross-appeal need only be asserted in the appellee's brief as provided by § 2-109(D)(4)."

Based upon our court rules, Samona, as an appellee, was required to identify her brief as a cross-appeal on the cover and in a separate section in compliance with § 2-109(D)(4). As in *In re Interest of Natasha H. & Sierra H., supra*, and *In re Interest of Chloe P., supra*, we decline to waive the rules on Samona's behalf and to award her affirmative relief. Accordingly, we do not consider her assignment of error and we affirm the juvenile court's termination of her parental rights to the minor children.

### 3. TERMINATION OF CORDELL'S PARENTAL RIGHTS

#### (a) Statutory Grounds for Termination

In its order terminating Cordell's parental rights to Naudia, the juvenile court found that the State proved by clear and convincing evidence that: (1) Cordell abandoned Naudia for the 6 months or more immediately prior to the filing of the petition (§ 43-292(1)); (2) Cordell substantially and continuously or repeatedly neglected and refused to give Naudia proper parental care and protection (§ 43-292(2)); (3) Naudia had been in out-of-home placement for 15 or more months of the most recent 22 months (§ 43-292(7)); and (4) Cordell subjected Naudia to aggravated circumstances, including, but not limited to abandonment, torture, chronic abuse, or sexual abuse (§ 43-292(9)).

Cordell does not challenge the court's finding that statutory grounds for termination existed under one or more of the subsections of § 43-292. The evidence shows that Naudia was removed from Samona's home in November 2013 and did not return to either parent's home at any time prior to the filing of the sixth supplemental petition and termination of parental rights, filed on October 27, 2015. Our review of the evidence clearly and convincingly shows that Naudia has been in out-of-home placement for at least 15 of the most recent 22 months and that grounds for termination of Cordell's parental rights under § 43-292(7) were proved by sufficient evidence. Therefore this court need not review the court's findings that grounds for termination existed under § 43-292(1), (2), and (9).

#### (b) Best Interests

In his cross-appeal, Cordell alleges the juvenile court erred in finding there was clear and convincing evidence that termination of his parental rights was in Naudia's best interests.

At the time the State filed the sixth supplemental petition and termination of Cordell's parental rights, the State also filed an ex parte motion for immediate custody with an affidavit for custody and removal. The affidavit alleged Cordell was incarcerated at the Nebraska State Penitentiary following convictions for assault in the second degree, use of a deadly weapon, and possession of a deadly weapon by a felon. The affidavit also alleged Naudia has mental health, behavioral, and legal concerns. She ran away from foster care and was arrested for charges including possession of alcohol and shoplifting. It was alleged that Cordell is unable to provide housing, parenting, educational or academic support; he is unable to participate in school meetings; and cannot meet Naudia's physical or emotional needs due to his lengthy term of incarceration.

Evidence was presented to support the State's allegations regarding Cordell's incarceration. He has been incarcerated since 2006, when Naudia was approximately 4 years old, and his projected release date is in 2037. Naudia will be an adult before Cordell is released.

Brown testified that Cordell wrote letters to Naudia, which Brown delivered to Naudia. Naudia did not ask Brown to send letters to Cordell for her, and Brown testified that she was not sure whether, or how frequently, Naudia wrote back to Cordell. Brown talked to Naudia about the options for visitation, but Naudia never asked her to set up a visit with Cordell at the penitentiary. Brown and Dilts testified that Cordell was not ordered to pay child support for Naudia and they were not aware that Cordell provided any financial contributions for her. Similarly, they were unaware that any visitation occurred between Naudia and Cordell during the pendency of this proceeding.

When Dilts became involved in this case, she sent an introductory letter to Cordell. Their correspondence regarding Naudia took place through letters and emails. Dilts testified that Cordell never asked her to provide him with a picture of Naudia and he did not ask her for visits. Dilts testified that she did not invite Cordell to participate in family team meetings because Naudia told her that she did not have a relationship with her father, and Naudia reported that she did not want to visit him. Cordell told Dilts, on one occasion, that when he last saw Naudia, she was about 4 years old.

Dilts testified that based upon her training, education, and work with the family, she believed that termination of Cordell's parental rights is in Naudia's best interests. Dilts' opinion was based upon Cordell's lack of involvement with Naudia over the last 10 years, his lack of availability, and the lack of a relationship between Cordell and Naudia. Dilts also cited Naudia's "high emotional needs" and stated that Cordell is not aware of those needs and has no capability to address them.

Cordell argues that he intervened almost immediately upon notification of the pending juvenile case and that he is up-to-date on his child support obligations. He asserts that he maintains a relationship with Naudia through phone calls and letters and that his telephonic attendance for one of Naudia's Individualized Education Plan (IEP) meetings shows that he is actively engaged in her life.

Although incarceration cannot be the sole basis for terminating parental rights, it is a factor to be considered. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). See, also, *In re Interest of DeWayne G. & Devon G.*, 263 Neb. 43, 638 N.W.2d 510 (2002). The Nebraska Supreme Court has noted that although incarceration itself may be involuntary as far as a parent is concerned, the criminal conduct causing the incarceration is voluntary. *Id.* Thus, in a case involving termination of parental rights, it is proper to consider a parent's inability to perform his or her parental obligations because of incarceration. *Id.* Incarceration of a parent, standing alone, does not furnish a ground for automatic termination of parental rights . . . however, it does not insulate a person from the termination of his parental rights if the record contains clear and convincing evidence that would support the termination of the rights of any other parent. See *In re Interest of DeWayne G. & Devon G., supra.*

The State established by clear and convincing evidence that Cordell has engaged in behavior that resulted in incarceration, thereby preventing him from taking care of and providing for his child. As previously stated, Cordell will not be available to meet Naudia's day-to-day needs

for many more years, and Cordell will remain incarcerated long after Naudia reaches the age of majority. Naudia has been in foster care for more than 3 years. She needs stability and permanency. Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Athina M., supra.* Naudia should not be made to wait for permanency given the lengthy term of imprisonment that Cordell is currently serving.

In our de novo review of the record, we find the State showed by clear and convincing evidence that termination of Cordell's parental rights is in Naudia's best interests.

## VI. CONCLUSION

We conclude the State proved by clear and convincing evidence that grounds for termination of Antony's and Cordell's parental rights existed under § 43-292(7), and that termination is in the children's best interests. Because Samona did not properly designate her brief as a cross-appeal, we do not address her assigned error. Accordingly, we affirm the orders of the juvenile court which terminated Antony's parental rights to Antonio, Quaronn, Kobe, Samaya, and Tania; Cordell's parental rights to Naudia; and Samona's parental rights to Antonio, Quaronn, Kobe, Samaya, Tania, Naudia, Daveon, Kirayle, Jordyn, Nia, and Kendrick.

AFFIRMED.