IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF JEREMIAH C. ET AL.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF JEREMIAH C. ET AL., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

BECKY P., APPELLANT, AND BRENDA E. ET AL., APPELLEES.

Filed January 9, 2024.    Nos. A-23-531 through A-23-533.

Appeals from the County Court for Cuming County: MICHAEL L. LONG, Judge. Affirmed.

Stuart B. Mills for appellant.

Daniel P. Bracht, of Law Offices of Daniel P. Bracht, P.C., L.L.O., for appellee State of Nebraska.

PIRTLE, Chief Judge, and MOORE and BISHOP, Judges.

PIRTLE, Chief Judge.

## I. INTRODUCTION

Becky P. appeals the orders of the Cuming County Court, sitting as a juvenile court, that terminated her parental rights to her three children, Jamarkus C., Jeremiah C., and Samuel P. For the reasons that follow, we affirm.

## II. BACKGROUND

### 1. FACTUAL BACKGROUND

Becky is the mother of Jamarkus, Jeremiah, and Samuel. Jamarkus was born in 2010, Jeremiah was born in 2011, and Samuel was born in 2019. Jeremiah is diagnosed with osteogenesis

imperfecta and brittle bone disease. While at the time of trial, he was 12 years old, he has the cognitive function of a 4-year old.

In 2016, Becky met Dustin P. At that time, Becky had Jeremiah and Jamarkus and Dustin had three of his own children: William, Mariah, and Zoey. William was approximately 6 years old, Mariah was 7 years old, and Zoey was 1 or 2 years old. Three months after meeting each other, Becky and Dustin moved in together. Because Dustin did not have full custody of his children, the household generally consisted of him, Becky, Jeremiah, and Jamarkus. However, pursuant to a custody arrangement with one of the mothers of his children, Dustin cared for William and Mariah every other week.

In June 2017, Becky and Dustin got married. Then sometime during fall 2019, Zoey began to live with them full-time. In December 2019, Dustin and Becky had Samuel together.

On January 11, 2020, law enforcement responded to a 9-1-1 call placed at Becky and Dustin's house. When officers arrived they heard yelling inside of the home. When they were eventually able to speak with Becky and Dustin, Becky was "crying and appeared to be very upset." She told officers that Dustin had shoved her several times and smashed her cell phone. Becky told officers that her right arm, right leg, and back were hurt during the incident. Dustin was arrested and later convicted of third degree assault for which he served 6 months in jail. Upon his release from jail, Dustin moved back into the home with Becky and the children.

In October 2020, Becky entered into a voluntary plan with the Nebraska Department of Health and Human Services (DHHS) to address the ongoing domestic violence concerns with Dustin. This plan involved Becky, Jeremiah, Jamarkus, and Samuel moving to a domestic violence shelter. While living in the shelter, Becky continued to contact Dustin over the phone and in person. After a few weeks, Becky abandoned the voluntary plan and moved back in with Dustin.

On November 19, 2020, law enforcement received an anonymous call that Becky had attacked Zoey. Zoey told the caller that Becky "picked her up off the couch and slammed her on the floor and then pinched her really hard on the leg." The caller mentioned there were other safety concerns involving the children, described Becky as "crazy," and explained that Becky and Dustin had a history of domestic violence that had resulted in law enforcement being called to their home multiple times.

On November 21, 2020, as a result of Zoey's report and Dustin's prior domestic violence, the State filed three petitions alleging Jamarkus, Jeremiah, and Samuel were within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (reissue 2016). The State also filed three ex parte motions for immediate placement of the children with DHHS. The juvenile court issued orders the following day that placed the children in the care, custody, and control of DHHS. On February 24, 2021, Becky pled no contest to the State's petitions. The court accepted her pleas and found the children to be within the meaning of § 43-247(3)(a). The children have remained in an out-of-home placement since their removal in November 2020.

Following the children's removal from Becky and Dustin's home, a visitation plan was put in place that allowed them joint supervised visits with Becky's children. Notably, Becky was not allowed to be involved in Dustin's visits with Zoey. During these visits, there was considerable tension between Dustin, Becky, the children, and the visit supervisors. Dustin and Becky would argue frequently during visits and refuse redirection by the supervision workers. These problems led to the children receiving conflicting instructions by the parents which would result in uneven

discipline. The supervision workers also reported that Becky and Dustin would compare their children and blame the children's behavior for their separation. Also during this time, Becky accused several visitation workers of sleeping with Dustin.

On July 21, 2021, Becky filed a restraining order against Dustin. Two days later, there was another domestic violence incident between Becky and Dustin. Dustin was arrested for domestic assault and violation of the protection order. Although it is not clear how long, Dustin served some time in jail related to this incident.

In November 2021, Becky told DHHS that she intended to divorce Dustin. Also around this time, DHHS separated Becky and Dustin's cases so they no longer had joint visits. However, there were several reports that Becky and Dustin were not abiding by the protection order and were continuing to have contact. Becky would tell DHHS that Dustin reached out to her and that she informed law enforcement of the protection order violation, but DHHS was unable to find any police reports of the incident. It appeared to DHHS that they were trying to conceal their relationship to avoid problems with DHHS.

Once Becky and Dustin's DHHS cases were separated in November 2021, Becky had individual supervised visitations with Jamarkus, Jeremiah, and Samuel. During these visits, DHHS continued to have concerns with Becky's parenting style. Visitation workers reported that she was not open to redirection, constantly yelled at the children, and provided inconsistent discipline. DHHS had to implement a rule that allowed visitation workers to terminate the visit if Becky failed to follow their redirections three times in one visit. In April 2022, Becky's behavior led to the suspension of her supervised visits because DHHS determined that they were not positive interactions for the children.

On April 12, 2022, Dustin was arrested again for violating the protection order and domestic assault. Related to this incident, Dustin was sentenced in October 2022, to 3 years in prison.

On July 26, 2022, 20 months after the children were removed from the home, the children's appointed guardian ad litem filed a motion to compel the State to file a supplemental petition to terminate Becky's parental rights. On August 5, the State filed a supplemental petition to terminate Becky's parental rights of Jamarkus, Jeremiah, and Samuel. On August 9, the State filed an amended supplemental petition and on November 7, the State filed a second amended supplemental petition that alleged:

> [T]he parental rights of the mother, [Becky] and her children . . . should be terminated pursuant to Section 43-292 (1), (2), (3), (6) and (7) of the Nebraska Revised Statutes. The specific actions and/or reasons are as follows;
>
> 1. The mother, [Becky], has abandoned the juveniles . . . for six months or more immediately prior to the filing of the petition.
>
> 2. The mother, [Becky], has substantially and continuously or repeatedly neglected and refused to give the juveniles . . . necessary parental care and protections.
>
> 3. [Becky] has willfully neglected to provide the juveniles . . . with the necessary subsistence, education, or other care necessary for their health, morals, or welfare or has neglected to pay for such subsistence, education or other care when legal custody of the juveniles . . . is lodged with others and such payment is ordered by the court.

4. Following a determination that the juveniles . . . [are persons] described in subdivision (3) (a) of Section 43-247, reasonable efforts to preserve and reunify the family, if required under section 43-283.01, under the direction of the court, having failed to correct the conditions leading to the determination and that such efforts should not be required with regard to the mother herein.

5. That it is in the best interests of the juvenile[s] that the parental rights of the mother, [Becky] . . . be terminated.

6. That the Juveniles have been placed in out of home placement for fifteen or more months of the most recent twenty-two months.

### 2. TERMINATION HEARING

A trial was held on June 8 and 9, 2023, to decide if Becky's parental rights to her three children would be terminated. Several witnesses testified on behalf of the State and Becky testified in her own defense.

### (a) Testimony of Dustin

The State's first witness was Dustin. He outlined that he lived with Becky and the children for nearly 3 years prior to their removal and that during that time he observed her behavior and parenting. He recalled that Becky often had a hard time managing all the children. When he left for work the children often "got out of control and chaotic very quickly." Soon after leaving, he would receive a call from a frustrated Becky with the children screaming in the background. He testified that Becky's interactions with the children involved constant anger and yelling. She would yell at his kids to stay away from her own so as to not infect them with their chaos. Dustin also explained that Becky demonstrated favoritism toward Jeremiah and then eventually toward Samuel once he was born. This resulted in Jamarkus getting "the brunt end of the stick" where Becky would unleash all of her frustrations on him. This led to Jamarkus having to "walk around on eggshells around [Becky]."

Dustin continued to explain that Becky's issues escalated after Samuel's birth in 2019. Following that, her "fuse got shorter and shorter." Becky's erratic behavior culminated in the November 2020 incident where she attacked Zoey. Following this incident and the removal of the children, Becky called Zoey a liar saying that she made the whole thing up and blamed Zoey for all of the trouble they were in with DHHS.

Dustin also described that Becky would make up stories to cause issues with him and the children. Throughout the period that Becky and Dustin had joint supervised visits, Becky made allegations that Dustin was sleeping with the DHHS and visitation workers. Dustin explained that if the worker was female he would notice that Becky's disposition toward them would shift over time and it would eventually come out that Becky thought Dustin was cheating on her with the worker.

When describing his thoughts about Becky's parenting, Dustin stated that she was able to meet the physical needs of the children, but not the mental ones. Dustin believed that she refused to change her behavior because she was set on doing what she wanted to do. Illustrative of this mindset was her refusal to stop using cornstarch to treat Samuel's diaper rash. Although Becky

- 4 -

was advised by her family doctor to use a diaper cream instead, she told Dustin, "[T]hat's my child and I am going to do what I want with my child." Overall, Dustin explained that he had not seen "a whole lot of progress from her" in developing better parenting skills so he was unsure if terminating Becky's parental rights was in the children's best interests.

(b) Testimony of Visitation Workers

Two visitation workers also testified at the trial and two more visitation workers' depositions were entered into evidence.

Andrea Matthews testified at the hearing and works for the visitation agency that supervised Becky's visits from November 2020 until October 2021. Matthews explained that she oversaw the family support workers that supervised Becky's visits and personally supervised some of the visits herself. She detailed consistent problems the agency had with Becky. The family support workers experienced problems with Becky making false accusations that the female visitation supervisors were having sexual relations with Dustin. There was also an incident where Becky refused to stop recording a session despite the visitation worker telling her that it was against agency policy. Matthews also outlined problems the agency had regarding Becky's parenting. The family support workers were particularly concerned about the way she yelled at the children. When Dustin was present, he and Becky loudly argued throughout the visit and gave the children conflicting instructions.

This hostile environment seemed to affect Jamarkus in particular. Matthews explained that Jamarkus' mood would change once the visit started. He would go from being happy to being very guarded.

The deposition of Melissa Santana was also entered into evidence at trial. Santana works for the visitation agency that supervised Becky's visits during October 2021 and then from February 2022 until March 2022.

The first period that Santana's agency worked with Becky began in early October 2021 and ended the same month after Becky was discharged due to the agency having safety concerns for its workers. During this time, the visitation workers were particularly concerned about the children not being able to "speak freely or give their opinions." When the children shared their feelings with Becky, she did not express empathy or validate their emotions. Instead, she always made it about her. Santana described Becky during this time as being unstable. Visitation workers reported to Santana that Becky told the children it was their fault they were removed and they had to do supervised visits. Santana explained that Becky's constant refusal to be redirected by the visit supervisors eventually became a safety issue for her staff. When Santana informed Becky of these issues, Becky was "loud and upset" and did not understand the safety concerns the agency had regarding the children and their staff. Due to these issues, the agency discharged Becky after only a few weeks.

The second period of Santana's involvement with Becky began in February 2022 and did not fare better with the agency terminating its services after six visits due to similar concerns. Santana described that Becky had not advanced in any of her parenting goals since the agency previously terminated its services. Becky continued to blame the children for the supervised visits and struggled with creating healthy boundaries with the children, utilizing successful discipline strategies and accepting redirections. She noted a specific instance where Jeremiah was taken to a

doctor after the school nurse reported that he was urinating more often and complaining of a burning sensation. Becky was adamant that due to Jeremiah's physical disabilities he could not feel between hot and cold so she was suspicious how the nurse knew it was burning. The visitation worker suggested that Jeremiah go see a doctor and Becky claimed to have made an appointment. But when they got to the doctor's office, no appointment had been made. While speaking to the doctor, Becky remained consistent that Jeremiah could not feel a burning sensation because he had damaged nerves.

Santana also experienced threatening behavior from Becky and Dustin. She explained that Becky was still in contact with Dustin at this time and her staff felt that Dustin was following them. In addition to this, Becky thought the visitation workers were not being truthful in their reporting of the visits and told Santana that she "was going to make sure that they . . . were not going to be working." As a result of this behavior, the visitation agency discharged Becky again.

The deposition of Thomas Catterson was also entered into evidence at trial. He works for the visitation agency that oversaw Becky's visits for 2 weeks in March and April 2022. During this period, his agency supervised three of her visits. The workers reported to Catterson that Becky was unwilling to accept redirection and constantly shouted and screamed at the children. This resulted in two of the three visits ending early. Due to these problems, the agency discharged Becky. Catterson reported that Becky attempted to call him so often in an attempt to work with them again that he had to block her phone number.

Nicole Hake testified at the trial and works for the visitation agency that supervised Becky's visits from March 2022 until the agency terminated its services in April 2022. During this time, there were two visits that were particularly concerning which resulted in them ending early. The first incident involved one of the children having a "melt down." Although Hake was unsure what child was involved, the situation devolved into a "screaming match" between the child and Becky. After Jeremiah expressed that he no longer wanted the visit to continue and wanted to return to his foster home, the visit was terminated. On the second occasion, the family was getting ready to have dinner and Becky would not allow Jamarkus to go to the bathroom alone. He began to incessantly plea that he "had to poop," but Becky wanted to accompany him. When Hake told Becky that she needed to let Jamarkus go to the bathroom "she went over and grabbed the side of his pants and just ripped them down." Jamarkus then "caused an injury which [Becky] was upset about" so the visit ended early. The agency eventually terminated its services with Becky, but Hake was not privy to the exact reasons why.

(c) Testimony of Becky's Counselors

Dr. Erik Snitchler also testified at the trial. Snitchler is a clinical psychologist that conducted Becky's psychological evaluation in April 2021. Snitchler conducted several assessments to determine whether Becky had any cognitive deficiencies that would hinder her receipt of therapeutic services. These assessments demonstrated that Becky had "low-average to below-average intellectual abilities." Snitchler testified that based on these results, Becky was fully able to participate in counseling and therapy, but it "may take longer" to see any progress.

Snitchler diagnosed Becky with adjustment disorder with depressed and anxious mood and an unspecified personality disorder. He also explained that she demonstrated signs of "defensive responding" which is essentially a lack of insight into her own problems. Snitchler described this

as her not even being aware that she is having struggles. He also reported that Becky made several inconsistent statements that "just seemed unusual or unlikely." For instance, Becky reported that she was given a house when she was 12 years old and lived on her own in that house afterward. When Snitchler pushed back on the unlikeliness of that statement, Becky persisted that it was true. Overall, Snitchler reported that Becky could benefit from counseling, but it would be difficult for a counselor to build rapport with her due to her lack of insight and paranoia.

Kirk Carmichael also testified at the trial. Carmichael was Becky's counselor from July 2021 until April 2023 when Becky terminated his services. Over this period, he met with Becky approximately 48 times. He initially diagnosed Becky with adjustment disorder with mixed anxiety and depressed mood. Carmichael reported that the biggest trigger of Becky's anxiety and depression was Dustin. Throughout their 48 sessions, he worked with Becky to establish coping strategies for her triggers. When he stopped seeing Becky in April 2023, he thought that she had made improvements, but her underlying diagnosis had not changed nor been resolved.

Carmichael also testified that Becky had made the decision not to sign a release allowing him to provide updates and information on her therapy and progress in the case. On two prior occasions she revoked releases which had allowed him to discuss her progress with DHHS. The latest revocation occurred after Becky had terminated his services.

Jessica Mulberry gave a deposition on May 31, 2023, which was entered into evidence at trial as exhibit 20. Mulberry is a mental health practitioner who offered therapy services to Becky from January 2023 until the time of the trial. Mulberry reported that Becky was highly committed to therapy, in that she attended nearly every session. However, Mulberry had concerns about Becky's "surface level participation" when it came to addressing her parenting. Many of the sessions were consumed by Becky's complaints with DHHS and Mulberry addressing boundary issues in their therapeutic relationship. Although Becky attended nearly every session, she struggled to acknowledge her own faults. She attributed any wrongdoing to others and was unable to take ownership of her actions.

Mulberry diagnosed Becky with paranoid personality disorder. Mulberry described Becky's paranoia as thinking that everyone was out to get her. She explained that Becky can be very stable when caring for herself, but when others are thrown into the mix, she has trouble regulating her emotions. Mulberry went on to state that Becky's paranoia prevents her from looking at her own actions and trying to improve because she feels like everyone is targeting her all the time. Illustrative of this is Becky leveling false accusations against the legal system, DHHS, and even Mulberry. Several months after working with Mulberry, Becky told DHHS that Mulberry was leaking details of her case plan. When Mulberry confronted her about this, Becky denied it. There was also an instance where Becky was secretly recording her therapy sessions which concerned Mulberry.

Mulberry also met with Jamarkus several times. She explained that Jamarkus did not want to see Becky because he was terrified of her. When Jamarkus first came to see Mulberry, he did not want to come in because he was scared that Becky was there. Based on her experience with Becky and Jamarkus, Mulberry believed the best interests of the children are to remain in their foster home.

(d) Testimony of Jennifer Banks

Jennifer Banks also testified at the trial. Banks is a child and family services specialist at DHHS and has been assigned to Becky's case since December 2020. When she started working with Becky, she established a plan that tried to get the children back home, addressed the dangers to the children, and developed strategies to correct the issues the family was facing. The concerns set out for Becky included domestic violence, inappropriate discipline, saying things to the children that were not appropriate, comparing the children, and arguments between her and Dustin. After Becky and Dustin's visits were separated in November 2021, Becky's case plan focused on her conduct involving the children.

Throughout Banks' association with Becky's case, Becky received multiple services. This included family support, supervised visitations, parenting courses, intensive family reunification, therapeutic services, case management, monthly contacts, team meetings, case planning, family assessments, gas vouchers, and transportation. Despite receiving all of these services, Banks reported that Becky failed to advance in any of the goals set out in her case plan. She did not make any progress in age-appropriate discipline, continued to levy false accusations against DHHS workers and visitation supervisors, and refused to acknowledge that she had anything to work on.

Banks explained that Becky's behavior hindered DHHS' efforts in helping her achieve her goals. She testified that Becky was more concerned about making false accusations against her and visitation workers than learning how to better parent her children. Becky attributed her not regaining custody of her children to Banks' incompetence and believed that if she was removed from the case, the children would be given back to her. This culminated in Becky attempting to get a protection order against Banks and her supervisor within 2 months of the trial. Additionally, Becky attempted to contact Banks' husband on Facebook and then proceeded to make a report that she was in contact with him on a dating website in an attempt to get Banks removed from her case. Banks felt that Becky was more focused on proving these accusations than trying to implement the strategies suggested to her.

Banks also had difficulty in getting information from Becky regarding her progress. Becky would tell Banks that she was receiving services for her children, but then refuse to sign release of information authorizations so that Banks could verify that the services were being rendered. This trend continued on several occasions with Becky refusing to sign releases so that her counselors could update Banks on her progress. In other instances Becky would sign the forms and then later revoke them if she disagreed with Banks about something. Banks also testified that Becky attempted to "triangulate" her counselors away from DHHS so that she was their only source of information. This led to Mulberry receiving completely different accounts of events from Becky than what she received from Banks.

In addition to Becky's issues with DHHS, she continued to struggle with parenting the children. She continued to blame the children for their separation from her and exhibited inconsistent discipline. During one visit she made the children raise their hand if they needed to use the bathroom or talk and then during the next visit they were allowed to do whatever they wanted. During other visits she would handle the children well and then the following day she would resort to using "military-like" discipline that involved the use of a whistle. The uneven discipline often led to Becky being harsher with Jamarkus. In one instance, Becky scolded

Jamarkus after Samuel got hurt while playing. Becky told Jamarkus that if Samuel got hurt CPS would come take them away.

Visitation supervisors reported to Banks that they constantly needed to redirect Becky's behavior, but she would refuse to listen. This led to Banks implementing the rule where Becky would only be given three redirections before ending the visit early. With these problems persisting, it was determined that the supervised visitations were not positive interactions for the children, so they were suspended in April 2022.

Banks also explained that Becky had not shown enough progress to where she thought she was able to stay away from Dustin once he is released from prison. She described Becky's history of accepting Dustin back into her life while failing to acknowledge the risks of domestic violence. This included her telling DHHS that she wanted nothing to do with Dustin, while continuing to have contact with him in violation of the protection order.

Banks concluded by stating that she thought the best interests of the children were served by terminating Becky's parental rights. She explained that Becky had been given numerous chances and resources over the years and had not changed. She further stated that it would be detrimental to the children if Becky's parental rights were only terminated as to one or two of the children so her rights should be terminated for all three children.

### (e) Testimony of Matthew Sheriff

Matthew Sheriff also testified at the trial. Sheriff has been Jamarkus' counselor since April 2022. In addition, he conducted two family sessions that included Becky in June 2022. Sheriff began seeing Jamarkus because he was having significant stressors related to Becky's visitations. He diagnosed Jamarkus with major depression and general anxiety as well as some adjustment issues. After seeing Jamarkus for approximately 2 months, he held two family sessions with Becky. He stopped having the family sessions because Jamarkus indicated that Becky was being untruthful during them and Sheriff thought continuing them would impact his relationship with Jamarkus. Sheriff also explained that his decision to pause the family sessions was impacted by his revelation that Becky secretly recorded one or both of the sessions. At the time of trial, Sheriff believed that Jamarkus was making advances on his diagnoses of depression and anxiety.

### (f) Testimony of Morgan Nichelson

Morgan Nichelson is an intensive family preservation therapist who worked with Becky, Jamarkus, Jeremiah, and Samuel beginning in March 2023. The family was referred to Nichelson to help address certain behaviors Jamarkus was exhibiting, preserve the family, and build a routine of school and therapy for all three children.

At this time, Jamarkus was displaying sexualized behavior, damaging property, and refusing to do schoolwork. After meeting with her three times a week for 12 weeks, Nichelson identified issues that led to this behavior. One of Nichelson's main concerns was that Jamarkus was very fearful. Jamarkus expressed concern about going out at night because he was afraid that someone was going to take him. Nichelson explained that Jamarkus was particularly afraid of Becky. Jamarkus described several incidents that Nichelson identified to be sources of this fear. On several occasions, Becky locked him and Jeremiah in their room for extended periods of time, to where they had to urinate out of a window. Additionally, Jamarkus was "very specific" about

how Becky "beat [him] with belts and pinched [him] on the inner thigh." Nichelson described that when Jamarkus told her this information, Jeremiah was also present. Upon Jamarkus detailing these behaviors, Jeremiah got physically sick. His "face got all red," he was "sweating and began salivating at the mouth."

Jamarkus also communicated other issues he had with Becky. He thought Becky treated the children unequally. Because Becky favored Jeremiah and Samuel, Jamarkus often felt isolated. He had more responsibility than the other children which included taking care of Samuel, getting his meals ready, changing his diaper when needed, and preparing his bottle. Jamarkus told Nichelson that he took care of Jeremiah and Samuel when Becky and Dustin went outside to smoke a "funny substance." He also stated that Becky would make things up in order to punish him and take things away.

Jamarkus also told Nichelson that he did not like visits with Becky because of the way that she acted toward workers. She would yell at them which made him uncomfortable and nervous. Jamarkus also expressed a constant fear that Becky would take Jeremiah and Samuel away from him.

### (g) Testimony of Becky

Becky testified at trial in her own defense. She explained that when she was living with Dustin the house was only chaotic when he was home. She claimed that when he was gone, "it was quiet and calm and very relaxed." She also stated that the last time she had a visit with her children was in April 2022.

She testified that she initially pled no contest to the State's petitions so she could benefit from the services DHHS offered. She believed that she successfully complied with the strategies suggested by DHHS. She stated that she put a lot of effort into learning all different kinds of parenting and was open to feedback throughout the pendency of the case. She stated that she was involved with the services and texted and called when she had concerns with visits. She also discussed how she completed two parenting courses, one in February 2021 and the other in June 2023. Additionally, she completed a course about nonviolent discipline sometime in 2021 and an intensive family reunification program in September 2021. She also stated that she is currently involved in counseling at a center for domestic violence victims.

Becky then discussed how she keeps track of the children's medical records and ensures that they receive the care they need. She also described that she is up to date on her child support payments and is employed full-time and has an apartment. She concluded by saying that she was not sure how much more stable she could be.

### 3. JUVENILE COURT'S ORDER

On June 23, 2023, the juvenile court entered orders terminating Becky's parental rights to Jamarkus, Jeremiah, and Samuel. The court's orders first found that the State failed to prove its first three allegations that alleged Becky had (1) abandoned the juveniles; (2) substantially and continuously or repeatedly neglected and refused to provide them necessary parental care and protections; and (3) willfully neglected to provide them with the necessary subsistence, education, or other care necessary for their health, morals, or welfare. However, it found that the State proved by clear and convincing evidence that Becky had failed to correct the conditions leading to the

termination and that the termination of her parental rights was in the best interests of the children. Additionally, the court found that the State proved by clear and convincing evidence that the juveniles fell within the meaning of Neb. Rev. Stat. § 43-292(7) (Reissue 2016) as they had been in an out-of-home placement for 15 or more months of the most recent 22 months. Becky now appeals each of the court's three orders that terminated her parental rights. We have consolidated the three appeals for purposes of our review.

## III. ASSIGNMENTS OF ERROR

Becky assigns that the juvenile court erred in determining that it was in the best interests to terminate her parental rights to Jeremiah, Jamarkus, and Samuel.

## IV. STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021).

## V. ANALYSIS

Termination of parental rights is a two-part inquiry. The juvenile court must first find by clear and convincing evidence that one of the statutory grounds under § 43-292 is met and second that termination is in the child's best interests. See *In re Interest of Alec S.*, 294 Neb. 784, 884 N.W.2d 701 (2016). There are 11 bases for parental termination under § 43-292. Only one must be met to provide the statutory basis for termination. See *In re Interest of Mateo L. et al., supra.* Once one of the bases is met, the appellate court does not need to consider the sufficiency of evidence concerning the State's other bases for termination. *Id.*

Becky concedes that a statutory requirement under § 43-292 was met. Although Becky concedes this point, for the sake of completeness, we conclude that the statutory ground under § 43-292(7) was met. The State provided clear and convincing evidence that the children had been in an out-of-home placement for 15 or more months of the most recent 22 months as required by § 43-292(7). Jamarkus, Jeremiah, and Samuel were removed from the family home in November 2020, and have remained in an out-of-home placement ever since. Therefore, as of the date the State first petitioned for the termination of Becky's parental rights, the children had been in an out-of-home placement for approximately 21 continuous months. As one of the statutory grounds under § 43-292 was met, we do not need to consider the sufficiency of the evidence regarding the other bases for termination.

We now consider whether it was in Jamarkus, Jeremiah, and Samuel's best interests to terminate Becky's parental rights. A child's best interests are presumed to be served by having a relationship with his or her parent. *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020). This presumption is overcome only when the State has proved that the parent is unfit. *Id.* The best interests analysis and the parental fitness analysis are separate inquiries, but each examines essentially the same underlying facts as the other. *Id.* In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a

reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being. *Id.*

In determining whether a parent is unfit, the law does not require perfection of a parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child. *Id.* As children cannot and should not be suspended in foster care or be made to await uncertain parental maturity, when a parent is unable or unwilling to rehabilitate themselves within a reasonable period of time, the child's best interests require termination of parental rights. See *In re Interest of Alec S., supra*. Last minute attempts by a parent to comply with the rehabilitative plan do not prevent the termination of parental rights. *Id.*

Becky asserts the termination of her parental rights is not in the best interests of the children. She contends that "the vast majority of [her] past failings stem from her abusive relationship with Dustin." Brief for appellant at 11. Essentially, she asserts that with Dustin incarcerated she is now better able to parent her children. In this argument, Becky cites *In re Interest of Chloe C.*, 20 Neb. App. 787, 835 N.W.2d 758 (2013), where our Court considered the lack of progress made by a mother dealing with domestic abuse. The court found that when considering the surrounding circumstances of the mother's history of domestic violence, she demonstrated a continued improvement in her parenting skills and established a beneficial relationship with her children. *Id.* Once the mother was able to "break out of [the] cycle of [domestic] violence", she was able to make efforts toward meeting her case plan goals. *Id.* at 796, 835 N.W.2d at 765. In its analysis, the court attributed the harm that befell the children to the mother's involvement with her abuser. *Id.* Once she got away from her abuser, she was able to live independently, maintain steady employment, interact appropriately with the children, and implement suggestions from caseworkers. *Id.* Additionally, the evidence demonstrated that the children were "always very excited to see [the mother] and enjoyed their visits with her." *Id.* at 797, 835 N.W.2d at 765. With these findings, our court found that it was not in the children's best interests to terminate the mother's parental rights. *Id.*

Becky asserts that this case stands for the proposition that a lack of progress in a parenting plan can be hindered by a parent being a victim of domestic violence. We agree that a parent's history of domestic violence is relevant in determining whether they are capable of continued improvement in parenting skills and a beneficial relationship between parent and child. This is particularly true in cases like *In re Interest of Chloe C., supra*, where a parent demonstrates positive changes when removed from a situation involving domestic violence.

However, we find the matter at hand presents a vastly different situation than the one in *Chloe C.*, and that the best interests of Jamarkus, Jeremiah, and Samuel are served by terminating Becky's parental rights. Throughout the pendency of this case, and even after Dustin was removed from her life, Becky exhibited poor parenting skills and mental instability that harmed her relationships with her children.

Before and after Dustin's incarceration, Becky demonstrated that she was either incapable or unwilling to implement positive changes to her parenting style. When she was living with Dustin and having joint visitation with him, visitation workers reported that Becky yelled at the children during visits, blamed them for their separation, and made false accusations that the workers were sleeping with Dustin.

After filing her protection order against Dustin in July 2021, Becky had individual supervised visits with the children. Although Dustin was not a part of these visits, Becky still screamed at the children, utilized inconsistent discipline, blamed them for being separated, and refused to follow the supervision workers' suggestions.

In a letter Jamarkus wrote to the court, he expressed that he faked being sick to avoid visits with Becky. He stated that he cried when he came back from visiting her and that his memories of Becky were "bad memories." Eventually DHHS suspended the visitations because they were not positive for the children. Overall, from the time she began individual supervised visits to when the visits were suspended, three agencies terminated Becky's services due to safety concerns.

Even after Dustin was incarcerated in April 2022, Becky continued to be difficult to work with. She failed to sign release authorizations so that service providers could update Banks on her progress and continued to make false accusations against caseworkers. Mulberry, who started seeing Becky as recently as March 2023, reported that Becky falsely accused her of leaking details of her case plan. And Banks testified that within the last 2 months before the trial, Becky filed a protection order against her and her supervisor in an attempt to get her removed from the case. This behavior led Banks to testify that Becky had not made any progress over the last 3 years toward achieving the goals of her case plan.

Additionally, Becky received diagnoses from mental health practitioners that indicate she continues to have trouble with self-reflection and paranoia. In April 2021, Snitchler diagnosed Becky with an adjustment disorder with depressed and anxious mood, and a rule-out diagnosis of an unspecified personality disorder. He explained that she demonstrated a lack of insight into her own problems which leaves her unaware that she is even having struggles.

In March 2023, Mulberry diagnosed Becky with paranoid personality disorder and stated that Becky thought everyone was out to get her. She also indicated Becky's paranoia prevents her from looking at her own actions and trying to improve because she feels like everyone is targeting her all the time. Carmichael diagnosed Becky with adjustment disorder with mixed anxiety and depressed mood and stated that her underlying diagnosis had not been resolved when he stopped seeing her in April 2023.

Becky's behavior confirms that she has problems with self-reflection and holding herself accountable. Despite receiving a multitude of services meant to help reunify her with her children, Becky continues to blame others for her involvement with DHHS. This includes her children, Dustin's daughter Zoey, Banks, and the legal system at large. Her testimony at trial further demonstrates her inability to see her own shortcomings. She claimed that when Dustin was not present during the visits, they were calm and relaxed. This is inapposite to the various visitation workers' reports that describe her yelling at, comparing, and blaming the children throughout the supervised visits.

It is not surprising that Becky's behavior has negatively impacted her relationships with her children. Jamarkus and Jeremiah expressed fear of Becky and indicated they did not want to see her. Jamarkus indicated to Mulberry that he was terrified of Becky and Jeremiah got physically ill when she was brought up. In the letter Jamarkus wrote to the court, he expressed that Becky makes him feel unsafe and that the memories he has of her are "bad memories."

We conclude that Becky failed to demonstrate continued improvement in parenting skills and beneficial relationships between her and her children. The evidence presented displays that

she is unable or unwilling to rehabilitate herself within a reasonable period of time. Because Jamarkus, Jeremiah, and Samuel should not be suspended in foster care indefinitely and be made to await Becky's uncertain parental maturity, their best interests require the termination of Becky's parental rights.

## VI. CONCLUSION

For the foregoing reasons, we affirm the juvenile court's termination of Becky's parental rights of Jamarkus, Jeremiah, and Samuel.

AFFIRMED.